# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

JANE DOE, et al.; JANE JONES, et al.; MARIA MOE,

*Plaintiffs-Appellees,*

v.

PAMELA BONDI, in her official capacity as Attorney General of the United States, et al.; DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Columbia

## CONSOLIDATED BRIEF FOR APPELLEES

**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**
Ernest Galvan
Kara J. Janssen
Adrienne Spiegel
Ben Hattem
101 Mission Street, Sixth Floor
San Francisco, CA 94105-1738
Telephone: (415) 433-6830

**LOWENSTEIN SANDLER LLP**
Alexander Shalom
Natalie J. Kraner
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 262.6700

**NATIONAL CENTER FOR**
**LGBTQ RIGHTS**
Shannon Minter
Amy Whelan
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: (415) 365-1338

**GLBTQ LEGAL ADVOCATES &**
**DEFENDERS**
Jennifer L. Levi
Sarah Austin
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350

**BROWN GOLDSTEIN & LEVY, LLP**
Eve L. Hill
120 East Baltimore Street, Suite 2500
Baltimore, MD 21202
Telephone: (410) 962-1030

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

### A.    Parties and Amici

Plaintiffs in district court, and appellees here, are nineteen people in the custody of the Federal Bureau of Prisons. With the permission of the district court, Plaintiffs-Appellees are proceeding pseudonymously in this litigation. *Jones v. Bondi*, Dkt Nos. 14, 47; *Doe v. Bondi*, Dkt. 7; *Moe v. Trump*, Dkts. 7, 67. Their pseudonyms are Jane Doe, Mary Doe, Sara Doe, Emily Doe, Zoe Doe, Tori Doe, Olivia Doe, Susan Doe, Lois Doe, Sally Doe, Wendy Doe, Rachel Doe, Ellen Doe, Jane Jones, Amy Jones, Barbara Jones, Carla Jones, Donna Jones, and Maria Moe.[1]

Defendants in district court, and appellants here, are Donald J. Trump, in his official capacity as President of the United States; Pamela Bondi, in her official capacity as Attorney General of the United States; and William K. Marshall III, in his official capacity as Director of the Federal Bureau of Prisons.[2] Defendant Donald J. Trump is only a party in *Moe v. Trump*. There were no additional parties

---

[1] Plaintiff Sophia Doe voluntarily dismissed her claims on May 12, 2025. *Doe v. Bondi*, ECF No. 80.

[2] This action was originally brought against Defendant James R. McHenry, III, in his official capacity as Acting Attorney General of the United States, and William Lothrop, in his official capacity as Acting Director of the Federal Bureau of Prisons. Attorney General Bondi and Director Marshall were automatically substituted as parties under Federal Rule of Civil Procedure 25(d) and Federal Rule of Appellate Procedure 43(c)(2).

and no *amici curiae* in the district court. One *amicus curiae* brief was filed on May 16, 2025, by Idaho, Indiana, 23 other states, and the Arizona Legislature in support of Appellants. Dkt. No. 2116284.

### B.  Rulings Under Review

The Honorable Royce C. Lamberth issued initial orders granting Plaintiffs' motions for preliminary injunctions on February 18, February 24, and March 19, 2025, in *Doe v. Bondi* (Dkt Nos. 44, 55, 68); March 10, 2025, in *Moe v. Trump* (Dkt. No. 62); and February 24 and March 3, 2025, in *Jones v. Bondi* (Dkt Nos. 28, 46). Some of the orders are available at *Doe v. Bondi*, No. 1:25-cv-286, 2025 WL 596653 (D.D.C. Feb. 24, 2025); *Doe v. McHenry*, No. 1:25-cv-286, 2025 WL 596651 (D.D.C. Feb. 18, 2025); *Jones v. Bondi*, No. 1:25-cv-401, 2025 WL 923117 (D.D.C. Feb. 24, 2025); and *Jones v. Bondi*, No. 1:25-cv-401, 2025 WL 923755 (D.D.C. Mar. 3, 2025). *See also* JA168–69 (*Doe* Feb. 18 Order), JA185–88 (*Doe* Feb. 24 Order), JA240–43 (*Doe* Mar. 19 Order), JA333–34 (*Jones* Feb. 24 Order), JA445–49 (*Jones* Mar. 3 Order), and JA569–71 (*Moe* Mar. 10 Order). The district court issued renewed preliminary injunctions in all three cases on May 15, and May 22, 2025. *See* JA954–62.

/ / /

/ / /

/ / /

**C.    Related Cases**

This case has not previously been before this Court.  There is one related

case for purposes of D.C. Circuit Rule 28(a)(1)(C): *Kingdom v. Trump*, No. 1:25-

cv-00691-RCL (D.D.C.).

*/s/ Kara Janssen*
Kara Janssen

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT .............................................................2

STATEMENT OF THE ISSUES...................................................................3

PERTINENT STATUTES AND REGULATIONS ......................................3

STATEMENT OF THE CASE.....................................................................4

I.      Plaintiffs Are a Uniquely Situated Small Group of Transgender
        Women in BOP Custody Who Have Spent Extended Time (for Some,
        Their Entire Incarceration) Living in Women's Facilities. ...............4

II.     Pursuant to BOP Policies and PREA Regulations, BOP Placed
        Plaintiffs in Women's Facilities for Safety and Security Reasons.................6

III.    EO 14168 Contravenes the PREA Regulations' Mandatory
        Individualized Assessments and Strips BOP of its Discretion over
        Safe Housing Placements and Medical Care.................................10

IV.     Pursuant to EO 14168 and in Direct Violation of PREA Regulations,
        BOP Decided to Transfer Plaintiffs from Women's Prisons. .......................12

V.      Plaintiffs Obtained Preliminary Injunctions Protecting Them from
        Transfers from Women's Prisons and Loss of Medication. ...........................14

STANDARD OF REVIEW ........................................................................16

SUMMARY OF THE ARGUMENT ..........................................................17

ARGUMENT .............................................................................................19

I.      PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF
        SUCCESS ON THEIR CLAIMS. .............................................................19

        A.      The District Court Did Not Abuse its Discretion in Finding that
                Plaintiffs Are Likely to Succeed on the Merits of their Eighth
                Amendment Claim. ....................................................................19

                1.      Plaintiffs Face Substantial Risks of Violence and Other
                        Serious Harm If Transferred from Women's Facilities.............19

                2.      Defendants Knew of and Disregarded These Substantial
                        Risks. ........................................................................25

B.    Plaintiffs Are Also Likely to Prevail on Their Claims Under the Administrative Procedure Act. .......................................................... 29

    1.    Defendants' Implementation of the Executive Order Violates Notice and Comment Requirements ........................... 30

    2.    BOP's Action is Arbitrary and Capricious and Not in Accordance with Law. ............................................................. 33

C.    Plaintiffs' Claims are Not Barred by the PLRA Or Any Other Statute. .......................................................................................... 38

    1.    18 U.S.C. § 3621(b) Does Not Bar Judicial Review. .............. 38

    2.    Section 3625 Similarly Does Not Bar Plaintiffs' APA Claims. .................................................................................. 41

    3.    The District Court Correctly Found that No Administrative Remedy Was Available. ................................. 42

II.    PLAINTIFFS HAVE MET ALL OTHER REQUIREMENTS FOR PRELIMINARY INJUNCTIVE RELIEF ..................................................... 46

A.    Plaintiffs Have Shown They Will Suffer Irreparable Harm if the Government Implements EO 14168 and Transfers them from Women's Prisons. ................................................................................ 46

    1.    BOP's Prospective Violation of Plaintiffs' Eighth Amendment Rights Causes Irreparable Harm. ........................ 46

    2.    BOP's Implementation of EO 14168 Exposes Plaintiffs to a High Risk of Sexual Violence and Other Serious Harms. .................................................................................. 47

B.    The Balance of Equities and Public Interest Weigh in Favor of Preliminary Injunctive Relief. ........................................................... 49

III.    THE DISTRICT COURT'S ORDERS COMPLY WITH THE PRISON LITIGATION REFORM ACT ..................................................... 51

CONCLUSION ................................................................................................. 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page**

## CASES

Ahmad v. Jacquez,
    860 F. App'x 459 (9th Cir. July 1, 2021) ....................................................40

AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State,
    766 F. Supp. 3d 74 (D.D.C. 2025)....................................................34

Air All. Houston v. EPA,
    906 F.3d 1049 (D.C. Cir. 2018)....................................................32

Allentown Mack Sales & Servs., Inc. v. NLRB,
    522 U.S. 359 (1998)....................................................33

Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,
    897 F.3d 314 (D.C. Cir. 2018)....................................................46

Armstrong v. Newsom,
    58 F.4th 1283 (9th Cir. 2023)....................................................53

Armstrong v. Schwarzenegger,
    622 F.3d 1058 (9th Cir. 2010)....................................................52

AT&T Info. Sys., Inc. v. Gen. Servs. Admin.,
    810 F.2d 1233 (D.C. Cir. 1987)....................................................35

Bennett v. Spear,
    520 U.S. 154 (1997)....................................................30

Booth v. Churner,
    532 U.S. 731 (2001)....................................................43

Bowen v. Mich. Acad. of Fam. Physicians,
    476 U.S. 667 (1986)....................................................39

Brown v. Plata,
    563 U.S. 493 (2011)....................................................52

Camp v. Pitts,
    411 U.S. 1382 (1973)....................................................35

Chamber of Com. of U.S. v. Reich,
    74 F.3d 1322 (D.C. Cir. 1996)....................................................30

Chandler v. Fed. Bureau of Prisons,
    226 F. Supp. 3d 1 (D.D.C. 2016)....................................................42

*Citizens for Responsibility and Ethics in Washington (CREW) v. Federal Election Commission*,
 904 F.3d 1014 (D.C. Cir. 2018) ................................................................48

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
 473 U.S. 432 (1985) ...............................................................................37

*Clean Air Council v. Pruitt*,
 862 F.3d 1 (D.C. Cir. 2017) ....................................................................31

*Comstock v. McCrary*,
 273 F.3d 693 (6th Cir. 2001) ..................................................................23

*Consumer Energy Council of Am. v. FERC*,
 673 F.2d 425 (D.C. Cir. 1982) ................................................................32

*Cope v. Cogdill*,
 3 F.4th 198 (5th Cir. 2021) .....................................................................23

*Damus v. Nielsen*,
 313 F. Supp. 3d 317 (D.D.C. 2018) .........................................................36

*Davis v. District of Columbia*,
 158 F.3d 1342 (D.C. Cir. 1998) ..............................................................46

*DHS v. Regents of the Univ. of California*,
 591 U.S. 1 (2020) ...................................................................................33

*Disability Rts. Mont., Inc. v. Batista*,
 930 F.3d 1090 (9th Cir. 2019) ................................................................23

*Doctors for America v. OPM*,
 No. 1:25-cv-00322-JDB, 2025 WL 1357700 (D.D.C. Mar. 24, 2025) .........11

*Doe v. District of Columbia*,
 215 F. Supp. 3d 62 (D.D.C. 2016) ...................................................... 22, 29

*Doe v. Wash. State Dep't of Corr.*,
 No. 4:21-CV-5059-TOR, 2021 WL 2453099 (E.D. Wash. May 17, 2021) ..................................................................................................22

*Est. of Burgaz ex rel. Zommer v. Bd. of Cnty. Comm'rs*,
 30 F.4th 1181 (10th Cir. 2022) ...............................................................23

*Est. of Miller ex rel. Bertram v. Tobiasz*,
 680 F.3d 984 (7th Cir. 2012) ..................................................................23

*Estelle v. Gamble*,
 429 U.S. 97 (1976) .................................................................................19

*Farmer v. Brennan*,
 511 U.S. 825 (1994) ................................................................ 19, 22, 23, 29

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)..................................................................... 32, 33

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*,
954 F.3d 118 (2d Cir. 2020) .......................................................36

*Fields v. Smith*,
653 F.3d 550 (7th Cir. 2011) ......................................................52

*Finnegan v. Kink*,
No. 3:20-cv-00218-GCS, 2024 WL 1345632 (S.D. Ill. Mar. 29, 2024) .......22

*Fletcher v. Menard Corr. Ctr.*,
623 F.3d 1171 (7th Cir. 2010) ....................................................45

*Fristoe v. Thompson*,
144 F.3d 627 (10th Cir. 1998) ....................................................42

*Gilliam v. Dep't of Pub. Safety & Corr. Servs.*,
No. MJM-23-1047, 2024 WL 5186706 (D. Md. Dec. 20, 2024) .................22

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
920 F.3d 1 (D.C. Cir. 2019)........................................................32

*Hatim v. Obama*,
760 F.3d 54 (D.C. Cir. 2014)......................................................50

*Hoffer v. Sec'y, Fla. Dep't of Corr.*,
973 F.3d 1263 (11th Cir. 2020) ..................................................52

*Hudson v. McMillian*,
503 U.S. 1 (1992).....................................................................27

*Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*,
41 F.4th 564 (D.C. Cir. 2022).....................................................31

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
955 F.3d 106 (D.C. Cir. 2020).....................................................17

*Int'l Refugee Assistance Proj. v. Trump*,
857 F.3d 554 (4th Cir. 2017) ......................................................51

*Jasperson v. Fed. Bureau of Prisons*,
460 F. Supp. 2d 76 (D.D.C. 2006)................................................41

*Jiau v. Tews*,
812 F. App'x 638 (9th Cir. 2020)................................................40

*Jones v. Bernanke*,
557 F.3d 670 (D.C. Cir. 2009)....................................................29

*Jones v. Bock*,
549 U.S. 199 (2007).................................................................42

*Kaemmerling v. Lappin*,
    553 F.3d 669 (D.C. Cir. 2008)............................................................. 43, 44

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020).................................................................49

*Kingdom v. Trump*,
    No. 1:25-cv-00691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025).... 34, 36

*Liquid Energy Pipeline Ass'n v. FERC*,
    109 F.4th 543 (D.C. Cir. 2024).................................................................32

*Lojan v. Crumbsie*,
    No. 12-CV-0320 (LAP), 2013 WL 411356 (S.D.N.Y. Feb. 1, 2013).... 22, 29

*Love v. Bureau of Prisons*,
    No. 24-CV-2571 (APM), 2025 WL 105845 (D.D.C. Jan. 15, 2025)...........41

*Martin v. Gerlinski*,
    133 F.3d 1076 (8th Cir. 1998) ................................................................42

*McBryde v. Comm. to Review Cir. Council Conduct*,
    264 F.3d 52 (D.C. Cir. 2001)...................................................................39

*McNary v. Haitian Refugee Ctr., Inc.*,
    498 U.S. 479 (1991)........................................................................... 40, 41

*MediNatura, Inc. v. FDA*,
    998 F.3d 931 (D.C. Cir. 2021).................................................................50

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................................. 33, 35

*Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Sullivan*,
    979 F.2d 227 (D.C. Cir. 1992).................................................................31

*Nebraska v. Su*,
    121 F.4th 1 (9th Cir. 2024) ................................................................ 30, 34

*Nken v. Holder*,
    556 U.S. 418 (2009).................................................................................49

*NRDC v. EPA*,
    643 F.3d 311 (D.C. Cir. 2011).................................................................32

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs*,
    496 F. Supp. 3d 31 (D.D.C. 2020)...........................................................33

*Orr v. Trump*, — F. Supp. 3d —, 2025 WL 1145271 (D. Mass. Apr. 18,
    2025) .................................................................................... 34, 37, 38

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015)...................................................................................31

*Pichardo De Veloz v. Miami-Dade Cty.*,
    756 F. App'x 869 (11th Cir. 2018).............................................21

*Powell v. Schriver*,
    175 F.3d 107 (2d Cir. 1999) ..................................................22

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
    758 F. 3d 296 (D.C. Cir. 2014)...............................................39

*Ramirez v. U.S. Immigr. and Customs Enf't*,
    310 F. Supp. 3d 7 (D.D.C. 2018).............................................47

*Rhodes v. Chapman*,
    452 U.S. 337 (1981)..............................................................23

*Richmond v. Scibana*,
    387 F.3d 602 (7th Cir. 2004) ................................................42

*Robbins v. Reagan*,
    780 F.2d 37 (D.C. Cir. 1985).................................................36

*Romer v. Evans*,
    517 U.S. 620 (1996)..............................................................38

*Ross v. Blake*,
    578 U.S. 632 (2016)................................................. 43, 44, 45

*S.F. A.I.D.S. Found. v. Trump*,
    No. 25-cv-01824-JST, 2025 WL 1621636 (N.D. Cal. June 9, 2025) ...........37

*Savage v. United States Department of Justice*,
    91 F.4th 480 (D.C. Cir. 2024).................................................45

*Serono Lab'ys, Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998)...............................................16

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022)..................................................46

*Stover v. Corrs. Corp. of Am.*,
    No. 12-cv-393, 2015 WL 874288 (D. Idaho Feb. 27, 2015).........................29

*Tay v. Dennison*,
    457 F. Supp. 3d 657 (S.D. Ill. 2020) .......................................22

*Touizer v. U.S. Att'y Gen.*,
    No. 21-10761, 2021 WL 3829618 (11th Cir. Aug. 27, 2021)......................40

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973)..............................................................37

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954)..............................................................36

*United States v. Hinds Cnty. Bd. of Supervisors*,
   128 F.4th 616 (5th Cir. 2025) ...................................................................53

*United States v. Skrmetti*,
   145 S. Ct. 1816 (2025) ..........................................................................4

*United States v. Windsor*,
   570 U.S. 744 (2013) ..............................................................................37

*Webster v. Doe*,
   486 U.S. 592 (1988) ..............................................................................39

*Williams v. Kincaid*,
   45 F.4th 759 (4th Cir. 2022) ..........................................................22, 36

*Wills v. Barnhardt*,
   No. 21-1383, 2022 WL 4481492 (10th Cir. Sept. 27, 2022) .......................40

*Winter v. NRDC*,
   555 U.S. 7 (2008) ..........................................................................16, 46

*Zollicoffer v. Livingston*,
   169 F. Supp. 3d 687 (S.D. Tex. 2016) .......................................22, 27, 29

## **STATUTES**

18 U.S.C. § 3621 ....................................................................... 38, 39, 41

18 U.S.C. § 3625 ............................................................................. 41, 42

18 U.S.C. § 3626 ...................................................................................51

28 C.F.R. § 115.41 .................................................................... 6, 26, 28

28 C.F.R. § 115.42 ......................................................................... passim

28 U.S.C. § 1292 ....................................................................................3

28 U.S.C. § 1331 ....................................................................................2

28 U.S.C. § 2201 ....................................................................................2

28 U.S.C. § 2202 ....................................................................................2

42 U.S.C. § 1997e ................................................................................43

5 U.S.C. § 553 ............................................................................... 30, 42

5 U.S.C. § 706 ............................................................................... 30, 33

## OTHER AUTHORITIES

Bureau of Just. Stats., U.S. Dep't of Just.,
*Sexual Victimization in Prisons and Jails Reported by Inmates,*
*2011–12: Supplemental Tables* (2014) ............................................... 8, 22, 27

Fed. Bureau of Prisons, Program Statement Cancellation of Statement No.
5200.08, Cancellation No. PSC04-2025 (Feb. 25, 2025) ............................12

## REGULATIONS

77 Fed. Reg. 37106 ............................................................................................30

90 Fed. Reg. 8615 ....................................................................................... 10, 11

90 Fed. Reg. 8757 ............................................................................................11

90 Fed. Reg. 8771 ............................................................................................11

90 Fed. Reg. 8853 ............................................................................................11

## MISCELLANEOUS

Devi Shastri, *Trump Administration Removing 988 Hotline Service Tailored*
*to LGBTQ+ Youth in July*, Associated Press (June 18, 2025) ......................11

Judd Legum & Rebecca Crosby, *The NSA's 'Big Delete'*, Popular
Information (Feb. 10, 2025) ..........................................................................11

Nico Lang, *Trump Is Purging Federal Websites of LGBTQ+ Content.*
*Here's What's Been Affected So Far*, Them, (Feb. 7, 2025) .........................11

# GLOSSARY

APA     Administrative Procedure Act

BJS     Bureau of Justice Statistics

BOP     Federal Bureau of Prisons

EO      Executive Order

JA      Joint Appendix

PI      Preliminary Injunction

PLRA    Prison Litigation Reform Act

PREA    Prison Rape Elimination Act

SHU     Segregated Housing Unit

TEC     Transgender Executive Council

TRO     Temporary Restraining Order

**INTRODUCTION**

This case concerns nineteen transgender women whom the Federal Bureau

of Prisons ("BOP") previously determined, after individualized assessments,

should be housed in women's facilities for their safety and security. The district

court did not abuse its discretion by ordering the Government to maintain

Plaintiffs' housing status while their claims proceed.

These women are a very small subset—less than one percent—of all

transgender individuals in BOP custody, and they were placed in women's

facilities due to their unique vulnerabilities. All have undergone extensive medical

treatment to transition and live as women. Some have only ever been housed in

women's facilities due to their obvious vulnerability to sexual violence. Others

were sexually assaulted when previously held in men's prisons. All were placed

in women's facilities based on BOP's careful evaluation of regulatory factors

designed to protect vulnerable prisoners from violence.

That changed when President Trump issued Executive Order 14168 ("EO

14168" or "the Executive Order") on January 20, 2025. The Executive Order

requires BOP to transfer these women to men's prisons regardless of their

individual circumstances. BOP concedes it has no discretion to consider the

Plaintiffs' safety or its own prior determinations when following this mandate.

The Executive Order strips away individualized protections that took nearly a

decade to develop under the Prison Rape Elimination Act ("PREA"), replacing them with a categorical mandate that ignores the serious risks these particular women face.

The court's preliminary injunctions were amply supported by Plaintiffs' evidence of the violence and self-harm they are likely to suffer if transferred from women's prisons. Plaintiffs are likely to succeed in showing that the categorical transfer policy mandated by the Executive Order violates their Eighth Amendment rights, and violates the Administrative Procedure Act by discarding duly promulgated PREA regulations without notice and comment, and by failing to provide any reasoned justification for the policy.

The preliminary injunctions should be affirmed. They preserve the housing arrangements that BOP itself determined were necessary to ensure these women's safety, pending resolution of Plaintiffs' constitutional and statutory claims.

## JURISDICTIONAL STATEMENT

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 2201, and 2202. JA201–02; JA340; JA461. The district court issued initial orders granting Plaintiffs' motions for preliminary injunctions in February 2025, and the district court issued renewed preliminary injunctions on May 15, and May 22, 2025. JA954–62. The Government filed timely notices of appeal of those preliminary injunction orders, and this Court consolidated its appeals on June 12,

2025. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

Did the district court abuse its discretion in finding that, based on their individual histories and circumstances, the evidence showed that these individual Plaintiffs would likely face a substantial risk of serious harm if they are transferred from women's facilities and that prison officials likely knew of and disregarded that risk?

Are Plaintiffs likely to succeed in showing that Defendants' adoption and implementation of the challenged EO violates the Administrative Procedure Act ("APA") because it directly conflicts with binding PREA regulations, was adopted and issued without notice and comment, lacks a reasoned explanation, and/or is arbitrary and capricious?

Did the district court abuse its discretion in finding that Plaintiffs are at immediate risk of irreparable harm and that the balance of equities and public interest weigh in favor of preliminary relief?

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

**I.** **Plaintiffs Are a Uniquely Situated Small Group of Transgender Women in BOP Custody Who Have Spent Extended Time (for Some, Their Entire Incarceration) Living in Women's Facilities.**

Plaintiffs[3] are a uniquely situated group of transgender women[4] incarcerated in BOP women's facilities who have undergone extensive medical treatment to transition and live as women and are regarded as women by the facilities in which they reside. Every Plaintiff has been designated and placed in women's housing by BOP. All Plaintiffs receive ongoing female hormone treatments from BOP. *See, e.g.*, JA645 ¶ 3; JA739–40 ¶¶ 4, 8; JA814 ¶ 3; JA903–05 ¶¶ 4–10. Some have been on hormones for decades, and many began hormone treatment long before their incarceration. *See, e.g.*, JA920, 969 ¶ 2. Many have also undergone surgical procedures as part of their transitions, including ███████████████ ███████████████████████. *See, e.g.*, JA286, 740 ¶ 5; JA232, 703 ¶ 6; JA916, 965 ¶ 8; JA947, 996 ¶ 5; JA951, 1000 ¶ 3. They are referred to as women; most have legally changed their names or gender markers on official records and

---

[3] Plaintiffs—assuming pseudonyms to protect their identities—are Jane, Mary, Sara, Emily, Zoe, Tori, Olivia, Susan, Lois, Sally, Wendy, Rachel, and Ellen Doe, *see* JA189; Jane, Amy, Barbara, Carla, and Donna Jones, *see* JA335; and Maria Moe, *see* JA490. Plaintiff Sophia Doe voluntarily dismissed her claims on May 12, 2025. *Doe v. Bondi*, ECF No. 80.

[4] Plaintiffs use the term "transgender women" to describe themselves, which is consistent with the approach of the United States Supreme Court. *See United States v. Skrmetti*, 145 S. Ct. 1816, 1830 n.2 (2025).

[4719763.3]

documents.  *See, e.g.*, JA286, 740 ¶ 6; JA375, 809 ¶ 18; JA947, 996 ¶ 6; JA951, 1000 ¶ 3.

After individualized assessments of their health and safety risks, BOP assigned Plaintiffs to women's facilities, where they have consistently resided for long periods of time.  *See, e.g.*, JA916, 965 ¶ 6 (Zoe Doe has been housed in women's prisons since ███); JA385, 819 ¶ 10; JA943, 992 ¶ 6; JA947–48, 996–97 ¶ 6; JA951, 1000 ¶ 3 (Donna Jones, Wendy, Sara, and Mary Doe have been housed in women's prisons since ███).  Prior to EO 14168, Maria Moe, Jane Jones, Rachel Doe, Wendy Doe, and Sara Doe had only ever been housed with women.  *See* JA233, 704 ¶ 7; JA286, 740 ¶¶ 8–10; JA492–93, 904–05 ¶¶ 7–9; JA947–48, 996–97 ¶ 6; JA951, 1000 ¶ 3.

BOP is aware that each Plaintiff has been diagnosed with gender dysphoria, which the agency has recognized as "a mental health diagnosis currently defined by DSM-5" that is "manifested by a stated desire to be the opposite sex and persistent discomfort with [one's] biologically assigned sex."  JA121.  Gender dysphoria is a "serious medical condition" that is highly treatable through "transition, which enables a transgender person to live in a sex other than their birth sex, and hormone therapy to feminize or masculinize the body."  JA181–82 ¶¶ 3–4; *see also* JA17, 578 ¶ 6; JA92 ¶ 5.  Treatment may also include "various surgeries."  JA182 ¶ 4.  "[T]here are no alternative treatments for effectively

managing gender dysphoria." *Id.* ¶ 6. Failure to treat gender dysphoria, or

cessation of treatment, "constitutes a serious medical risk that can severely impact

both physical and mental health," including "[i]ncreased risk of suicidal ideation

due to intensified gender dysphoria." JA93 ¶ 10; *see also* JA95 ¶ 19 ("The medical

community is well aware that the consequences of denying this care are predictable

and dire."). Based on their individual treatment histories, the district court found

that transferring Plaintiffs from women's prisons would exacerbate their gender

dysphoria. JA186–87.[5]

## II. Pursuant to BOP Policies and PREA Regulations, BOP Placed Plaintiffs in Women's Facilities for Safety and Security Reasons.

PREA's implementing regulations require BOP to conduct individualized

assessments when housing transgender people, including whether to place them in

women's facilities. *See* 28 C.F.R. § 115.42. Under PREA, BOP must consider a

variety of factors, including whether the individual has previously experienced

sexual victimization and the individual's perception of their own vulnerability, *id.*

§ 115.41(d)(8)–(9), and must use this information to make housing assignments

based on "individualized determinations about how to ensure the safety of each

---

[5] The district court explained that transferring these individuals from women's prisons would exacerbate their gender dysphoria "because they will be subject to searches by male correctional officers, made to shower in the company of men, referred to as men, forced to dress as men, or simply because the mere homogenous presence of men will cause uncomfortable dissonance." JA187 n.2.

inmate." *Id.* § 115.42(a)–(b).  The PREA regulations explicitly authorize housing

transgender women in women's facilities when doing so promotes safety and

security.  *Id.* § 115.42(c).

Until January 20, 2025, BOP used the "Transgender Executive Council"

("TEC") to implement these PREA regulations and oversee facility designations.

JA123–25.  The TEC considered "an inmate's security level, criminal and

behavioral/disciplinary history, current gender expression, programming, medical,

and mental health needs/information, vulnerability to sexual victimization, and

likelihood of perpetrating abuse."  JA125.  Since the Executive Order, BOP has

disbanded the TEC and rescinded its policies implementing PREA's individualized

assessment requirements for housing transgender persons.  *See* Appellants'

Opening Br. ("AOB") at 9.

The district court made specific factual findings that "BOP determined that

considering all statutorily and constitutionally required factors, a women's facility

was the appropriate facility" for these Plaintiffs.  JA186.  As the district court

explained, BOP "is subjectively aware that transferring the plaintiffs to a male

penitentiary would substantially increase the likelihood of them experiencing [a]

parade of harms," including "significantly elevated risk of physical and sexual

violence," and the exacerbation of "symptoms of their gender dysphoria."  JA164–

65.  BOP's assessment under its prior policy that these Plaintiffs should be housed

in women's facilities reflects its awareness not only of the high risk of sexual violence for incarcerated transgender people in general,[6] but that Plaintiffs' individual circumstances make this risk particularly acute. *Id*.

These safety concerns are not hypothetical. As detailed in their declarations, nearly all of the Plaintiffs who were previously housed in men's facilities were sexually assaulted when they were there, which ultimately resulted in their transfers to women's prisons to ensure their safety. *See, e.g.*, JA85, 646 ¶¶ 7–8; JA374–75, 808–09 ¶¶ 12, 17; JA382, 816 ¶ 8; JA385, 819 ¶¶ 6, 10; JA921, 970 ¶¶ 4, 6–7. Zoe Doe was stalked by a man in the showers of a medium-security men's facility. JA916, 965 ¶ 5. Donna Jones was raped in a shower at a men's facility, before she was transferred to a women's facility. JA385, 819 ¶ 6. Jane Doe was subjected to ███████████████████ while in a men's facility and continues to suffer from ████████████████████ as a result. JA85, 646 ¶¶ 7–8. Amy Jones was violently sexually attacked by three men while in a men's facility. JA374, 808 ¶ 12. Carla Jones was sexually assaulted in three separate men's facilities. JA382, 816 ¶ 8. Olivia Doe was "brutally raped" in a

---

[6] For example, a 2014 study by the Department of Justice estimated that nearly 35% of transgender people incarcerated in state and federal prisons were sexually victimized between 2007 and 2012. Bureau of Just. Stats., U.S. Dep't of Just., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Tables*, 2 tbl. 1 (2014), https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf.

men's facility, resulting in "medical complications." JA921, 970 ¶ 4. Emily Doe was raped while in a men's facility, JA934, 983 ¶ 4, as was Mary Doe "multiple times." JA943, 992 ¶ 6. And outside of BOP custody, Lois Doe was "raped twice" in a men's state facility. JA939, 988 ¶ 6.

Two of these assaults occurred in minimum-security men's facilities. JA374, 808 ¶¶ 10, 12; JA382, 816 ¶ 13. BOP knew of the assaults. *E.g.*, JA85, 646 ¶ 7; JA385, 819 ¶ 10; JA921, 970 ¶ 4; JA943, 992 ¶ 6. Such pervasive sexual assault is precisely the type of harm that PREA and its regulations seek to prevent. *See* 34 U.S.C. § 30302 (describing the first purpose of PREA as establishing "a zero-tolerance standard for the incidence of prison rape"). In addition, multiple Plaintiffs previously experienced suicidal ideation or engaged in suicide attempts or self-harm while housed in men's prisons. *See* JA381, 815 ¶ 5; JA915, 964 ¶ 4; JA921, 970 ¶ 5; JA934–35, 983–84 ¶¶ 3, 12. The district court was "unconvinced by the Government's proffered statistics attempting to show that a low-security men's facility" would be safe for these Plaintiffs. JA187 n.2.[7]

In sum, BOP determined that Plaintiffs' unique health and safety risks necessitated their placement in women's facilities. As part of that determination, BOP was also required to consider whether the placements would raise any

_____

[7] In addition, if any Plaintiffs are transferred by BOP, nothing restrains Defendants from transferring them to a men's prison with a higher security designation.

"management and security problems" for BOP staff or the other women housed with Plaintiffs.  28 C.F.R. § 115.42(c).  The Plaintiffs' housing assignments were repeatedly reaffirmed during the reassessments BOP was required to conduct at least twice a year.  *Id.* § 115.42(d).  BOP only sought to transfer Plaintiffs from women's facilities after the issuance of the Executive Order.

### III.    EO 14168 Contravenes the PREA Regulations' Mandatory Individualized Assessments and Strips BOP of its Discretion over Safe Housing Placements and Medical Care.

On January 20, 2025, President Trump issued Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025).  The Order stripped BOP of discretion over housing assignments for transgender people, consistent with this Administration's open disapproval of transgender people and its stated intention to deny them any legal recognition or protection.  In relevant part, the Order:  (1) categorically bars transgender women from women's prisons, regardless of individual safety considerations; and (2) prohibits BOP from providing "any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."  90 Fed. Reg. at 8616–17 ¶¶ 4(a), (c).

EO 14168 is part of a broader pattern of targeted discrimination against transgender people by this Administration, including reversing protections for

transgender people in schools, healthcare, military service, federal funding, shelters, and more.[8]  In addition, federal agencies have systematically removed information about transgender individuals from government websites,[9] including deleting the word "transgender" every time it appeared in agency documents. Most recently, the administration removed a dedicated suicide hotline available to transgender youth callers.[10]  BOP, for its part, issued a policy formalizing implementation of the Executive Order.  Fed. Bureau of Prisons, Memorandum for All Chief Executive Officers (Feb. 21, 2025), https://storage.courtlistener.com/ recap/gov.uscourts.dcd.278186/gov.uscourts.dcd.278186.1.1.pdf.  And it

---

[8] *See, e.g.*, Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025) (schools); Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025) (healthcare); Exec. Order No. 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025) (military service); Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (federal funding and shelters).

[9] *See* Mem. in Opp. to Pls.' Mot. for Preliminary Injunction, *Doctors for America v. OPM*, No. 1:25-cv-00322-JDB, 2025 WL 1357700 (D.D.C. Mar. 24, 2025) (stating that "under Executive Order 14168, webpages could no longer use the word 'gender' or contain language promoting gender ideology" and that "every" federal agency "promptly began to implement" the Order); *see also, e.g.*, Nico Lang, *Trump Is Purging Federal Websites of LGBTQ+ Content. Here's What's Been Affected So Far*, Them, (Feb. 7, 2025), https://www.them.us/story/trump-administration-federal-websites-lgbtq-content-deleted-cdc-doe-usaid; Judd Legum & Rebecca Crosby, *The NSA's 'Big Delete'*, Popular Information (Feb. 10, 2025), https://popular.info/p/the-nsas-big-delete?utm_campaign =post&utm_medium=web.

[10] Devi Shastri, *Trump Administration Removing 988 Hotline Service Tailored to LGBTQ+ Youth in July*, Associated Press (June 18, 2025), https://apnews.com/ article/988-lgbtq-suicide-prevention-hotline-trump-382342828b381b 6a32964f09fe9aa59c.

announced the "[c]ancellation" of the Transgender Offender Manual that specified the risks transgender people face and the actions agency staff should take to mitigate those risks. *See* Fed. Bureau of Prisons, Program Statement Cancellation of Statement No. 5200.08, Cancellation No. PSC04-2025 (Feb. 25, 2025); *see also* JA120 (stating objective of Transgender Offender Manual is "[t]o enhance staff's understanding of the increased risk of suicide, mental health issues and victimization").

## IV. Pursuant to EO 14168 and in Direct Violation of PREA Regulations, BOP Decided to Transfer Plaintiffs from Women's Prisons.

In response to EO 14168, BOP officials moved rapidly to transfer transgender women housed in women's prisons to men's prisons. While BOP claims it undertook an individualized review of "the inmates' assigned security level, disciplinary record, medical record, and psychology record" in making transfer decisions, *see* JA174, BOP's review was triggered solely by the challenged Executive Order and was done for the sole purpose of removing transgender women from women's facilities regardless of whether doing so would put them at increased risk of sexual violence. *See* JA186 (district court finding that "the *only* change in circumstances from when the initial housing determination was made to now is Executive Order 14168"). The timing and speed of the transfers further undercuts BOP's claim that these decisions were based on a considered, individualized review.

BOP transferred Plaintiffs Ellen Doe, Rachel Doe, and Jane Jones from women's to men's facilities.[11]  JA230, 701 ¶ 7; JA233, 704 ¶ 11; JA287, 741 ¶ 14. Once there, all three experienced continuous sexual harassment from male prisoners; invasive strip searches from male BOP officers; lack of access to women's clothing, including undergarments; and reasonably feared that they would be targeted for sexual violence.[12]

Male BOP officers conducted strip searches of Ellen Doe and Rachel Doe after they were moved from women's to men's prisons, requiring them to bend over, squat, and lift their breasts.  JA230, 701 ¶ 7; JA233, 704 ¶ 10.  Rachel Doe ▮▮▮▮▮▮▮, and before EO 14168 she had only ever been housed in women's facilities, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  JA232-33, 703–04 ¶¶ 6–7.  At the men's facility to which BOP transferred her after the Order, Rachel Doe experienced daily sexual harassment.  JA233–34, 704–05 ¶ 11.  She was not allowed to wear a bra, which made her even more vulnerable.  JA234, 705

---

[11] BOP informed other Plaintiffs of their pending transfer to men's facilities due to the EO, and, through counsel, Plaintiffs quickly filed their complaints and applications for emergency relief before BOP had an opportunity to make the transfers.  *See, e.g.*, JA930, 979 ¶ 8.  BOP staff told certain Plaintiffs that they could not challenge the transfers because the transfers were required under the Executive Order.  *See* JA494, 906 ¶ 12; JA88, 649 ¶ 14.

[12] Ellen, Rachel, and Jane were eventually transferred back to their assigned women's facilities and were protected from future transfers under the district court's preliminary injunctions.  JA240–43, 333–34.

¶ 15.  Ellen Doe's ████████████████████████████████

████████████████████████████████████; she experienced

constant sexual harassment at the facility.  JA230, 701 ¶ 8.

Plaintiff Jane Jones was transferred from a minimum-security women's

facility to a medium-security men's facility.  JA286–87, 740–41 ¶¶ 9, 14.  Jane

Jones has a vagina, and before her transfer she had never been housed in a men's

prison.  JA740 ¶¶ 5, 8.  Officials held her in the Segregated Housing Unit ("SHU")

at the men's facility for four days in solitary confinement.  JA288, 742 ¶ 16.  She

was made to wear male undergarments, held in a small cell with no outside or

recreational time, permitted extremely limited communication with family

members, told by BOP that her supply of female hormone medication would not be

renewed, and subjected to 24-hour surveillance by male guards, including while

using the restroom.  JA287–88, 741–42 ¶¶ 15–17.

## V.     Plaintiffs Obtained Preliminary Injunctions Protecting Them from Transfers from Women's Prisons and Loss of Medication.

Plaintiffs brought three separate actions against the Government alleging

that BOP, following the commands of EO 14168, had transferred or was preparing

to transfer Plaintiffs from women's facilities and end Plaintiffs' access to necessary

medical care, in violation of the Eighth Amendment, the Fifth Amendment, the

Rehabilitation Act of 1973, the Administrative Procedure Act, and separation of

powers principles.  *See* JA213–23, 356–67, 472–81.

Plaintiffs sought a declaratory judgment that Sections 4(a) and 4(c) of EO 14168 violate their constitutional and statutory rights, as well as a permanent injunction prohibiting the Government from enforcing those provisions of EO 14168 and requiring BOP to maintain Plaintiffs' preexisting housing and medical treatment. JA223, 367, 481. In all cases, Plaintiffs obtained temporary restraining orders (TROs) and preliminary injunctions (PIs) to enjoin enforcement of Sections 4(a) and 4(c) as to the named Plaintiffs. *E.g.*, JA157–67.

The TROs and PIs were all supported by factual findings about the serious harms Plaintiffs would face in men's facilities. The Government mischaracterizes the basis for the PIs. For example, it suggests that the district court granted the second PI in *Doe* and the second PI in *Jones* solely because BOP had found women's facilities "appropriate" for them and "only reassessed their housing due to EO 14168." *See* AOB at 18, 20. In fact, in its second *Doe* PI order, the district court also relied on findings that the *Doe* Plaintiffs would be subjected to a significantly elevated risk of sexual assault as well as a predictable worsening of gender dysphoria if transferred. JA186 (incorporating reasoning from first *Doe* order); JA187 n.2 (referring to risk of sexual assault and exacerbated gender dysphoria). The second *Jones* PI order also relied on those factual findings, as well as the fact that "the named Plaintiffs here were housed in men's facilities early in their incarceration, during which period they experienced numerous

unspeakable harms including multiple rapes, suicide attempts, and severe psychological distress." JA446–47.

The Government filed notices of appeal in all cases, challenging only the portion of the preliminary injunctions related to the Plaintiffs' housing. AOB at 5. This Court consolidated the cases for appeal. Order at 2, No. 25-5099 (Apr. 30, 2025). The district court then granted Plaintiffs' requests to issue renewed preliminary injunctions in all cases with the Government's non-opposition. JA954–62. The renewed injunctions will expire on August 23, 2025. JA955, 958, 961. The Government filed notices of appeal from the renewed injunctions, and this Court consolidated those appeals with the Government's appeals from the initial injunctions.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). On appeal from a preliminary injunction, this Court reviews the district court's "findings of fact under the 'clearly erroneous' standard," *Serono Lab'ys, Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998), its "legal conclusions *de novo*," and "its weighing of the four relevant factors for abuse of discretion." *In re Fed.*

*Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 111–12 (D.C. Cir. 2020).

## SUMMARY OF THE ARGUMENT

The district court properly granted preliminary injunctions to maintain the *status quo* and protect these uniquely situated Plaintiffs from sexual violence and other irreparable harm while this case proceeds.

Plaintiffs have demonstrated a strong likelihood of success on the merits of their Eighth Amendment claim. BOP previously conducted individualized assessments required by PREA and determined that these specific transgender women required placement in women's facilities for their safety and security. As the district court found, substantial evidence shows that these individuals are at risk of serious harm if transferred from women's to men's facilities. Defendants' disregard of these known risks is deliberate indifference.

Defendants' adoption of a new policy, replacing individualized determinations with a categorical rule that bars the placement of transgender women in a women's facility under any circumstances, also violates the APA. This new policy directly conflicts with existing PREA regulations, was adopted without the required notice and comment, and is arbitrary and capricious, as it reflects animus against transgender people and lacks any reasoned explanation.

The district court found that Plaintiffs face an imminent risk of irreparable

harm if transferred from women's facilities. The balance of equities and public interest favor Plaintiffs, as enforcement of an unconstitutional policy is never in the public interest, whereas Plaintiffs face serious irreparable harms including sexual violence and self-injury or suicide.

The Government's jurisdictional challenge fails. 18 U.S.C. § 3621(b) does not bar judicial review because Plaintiffs challenge a categorical policy mandated by Executive Order, not individual placement decisions under that statute. Similarly, the Prison Litigation Reform Act ("PLRA") does not bar these claims because no administrative remedy was available. BOP lacked authority to provide relief from the Executive Order, and Plaintiffs faced immediate transfer without any opportunity to exhaust remedies.

The district court's preliminary injunctions are narrowly tailored, necessary to prevent irreparable harm, and contain adequate findings under the PLRA. The injunctions merely preserve the *status quo* by maintaining housing placements that BOP itself previously determined were appropriate for these specific individuals' safety and security.

# ARGUMENT

## I.  PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THEIR CLAIMS.

### A.  The District Court Did Not Abuse its Discretion in Finding that Plaintiffs Are Likely to Succeed on the Merits of their Eighth Amendment Claim.

The U.S. Supreme Court made clear more than three decades ago that "prison officials have a duty … to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  "[D]eliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To prove an Eighth Amendment claim, Plaintiffs must establish that the conditions of their incarceration "pos[ed] a substantial risk of serious harm" and that prison officials "kn[ew] of and disregard[ed] an excessive risk" to their "health or safety." *Farmer*, 511 U.S. at 834, 837.  The district court correctly found that Defendants' decision to transfer Plaintiffs from women's to men's facilities—where Defendants know that Plaintiffs will face extremely high risks of physical and sexual violence, as well as excessive risks of self-harm and suicidality as a result of aggravated gender dysphoria—would likely violate the Eighth Amendment.

### 1.  Plaintiffs Face Substantial Risks of Violence and Other Serious Harm If Transferred from Women's Facilities.

To be clear, Plaintiffs do not argue that the Eighth Amendment requires every transgender woman to be housed in a women's prison, nor did the district

court so find. Rather, as the district court found, the particular vulnerabilities of these women—the same vulnerabilities that led BOP to house them in women's prisons in the first place—will result in predictable violence against them and a serious risk of self-harm if they are forced to live in men's prisons. *See* JA164–65.

Every Plaintiff has been placed in women's housing by BOP based on consideration of the relevant PREA factors. This distinguishes them both from other incarcerated transgender women and from men who may be vulnerable to sexual assault. If these Plaintiffs are transferred from women's to men's facilities, men in those facilities will know that BOP has transferred a woman to a men's facility. As the district court found, this puts them at extremely high risk of sexual victimization.

BOP's assessment that these Plaintiffs' individual situations require placement in women's facilities was well founded. Each has received extensive medical treatment in order to live as a woman. For all, this includes long-term hormone therapy. Some have had genital and other surgeries. Some have only ever been housed in women's prisons. Many were previously sexually victimized in men's facilities. This is an especially at-risk group, and all of these facts are known to BOP. That is why Plaintiffs are part of the small, unique group of transgender women whom BOP placed in women's facilities.

Plaintiffs presented extensive evidence to the district court that they would

be at substantial risk of serious harm if BOP is permitted to move them from women's prisons. All Plaintiffs would be at an excessive and obvious increased risk of sexual assault in men's prisons because they have been classified and housed as women and have undergone significant medical treatment; many are outwardly indistinguishable from non-transgender women.[13] *See supra* at 4–5. As set forth above, several Plaintiffs have had genital surgeries, and all receive female hormone therapy, which causes breasts to develop. *See supra* at 4.

Nearly all of the Plaintiffs who were previously housed in men's prisons were assaulted there (some multiple times), and they only escaped sexual violence when they were placed in women's prisons by the BOP. Olivia Doe was "brutally raped" in a men's facility; Amy Jones was violently attacked by two male prisoners; Donna Jones was raped in the shower; Jane Doe suffered ████████ ████████████████████; Carla Jones was sexually assaulted in three separate men's facilities; Emily Doe was raped; Mary Doe was "raped multiple times." *See supra* at 8–9. Others have a history of serious self-harm and suicidality when housed in men's facilities, as that placement caused their gender dysphoria symptoms to worsen. *See, e.g.*, JA815 ¶ 5; JA934 ¶ 3.

---

[13] *Cf. Pichardo De Veloz v. Miami-Dade Cty.*, 756 F. App'x 869, 877 (11th Cir. 2018) (finding that housing a woman among men "poses an outrageous risk that she will be harassed, assaulted, raped, or even murdered").

[4719763.3]

Plaintiffs' visible female characteristics, histories of sexual assault, and prior self-harm in men's facilities mark them as especially vulnerable members of a population that is already uniquely vulnerable to physical and sexual violence in men's facilities. *See, e.g.*, JA703 ¶ 6; JA808 ¶ 15; JA819 ¶ 6; *see also* Bureau of Just. Stats., U.S. Dep't of Just., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Tables*, 2 tbl. 1 (2014) (showing that from 2011 to 2012, 39.9% of transgender prisoners had experienced sexual violence in the past 12 months alone).[14] When BOP undertook its individualized assessment of Plaintiffs pursuant to PREA, it determined that these nineteen highly vulnerable transgender women should each be assigned to a women's facility. BOP was required to reassess Plaintiffs' housing placements at least every six months thereafter, 28 C.F.R. § 115.42(d), and it opted to keep each Plaintiff in women's

---

[14] The Supreme Court, federal courts of appeals, and federal district courts throughout the country have also recognized that transgender women face a high risk of sexual assault and abuse in men's prisons. *See, e.g.*, *Farmer*, 511 U.S. at 848-49; *Williams v. Kincaid*, 45 F.4th 759, 778–79 & n.11 (4th Cir. 2022); *Powell v. Schriver*, 175 F.3d 107, 115 (2d Cir. 1999); *Tay v. Dennison*, 457 F. Supp. 3d 657, 684 (S.D. Ill. 2020); *Doe v. District of Columbia*, 215 F. Supp. 3d 62, 77 (D.D.C. 2016); *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 691, 696 (S.D. Tex. 2016); *Gilliam v. Dep't of Pub. Safety & Corr. Servs.*, No. MJM-23-1047, 2024 WL 5186706, at *12–13 (D. Md. Dec. 20, 2024); *Finnegan v. Kink*, No. 3:20-cv-00218-GCS, 2024 WL 1345632, at *11 (S.D. Ill. Mar. 29, 2024); *Doe v. Wash. State Dep't of Corr.*, No. 4:21-CV-5059-TOR, 2021 WL 2453099, at *5 (E.D. Wash. May 17, 2021); *Lojan v. Crumbsie*, No. 12-CV-0320 (LAP), 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013).

facilities until the issuance of EO 14168.

The harms Plaintiffs face if removed from women's prisons are "sufficiently serious" to meet the objective element of the Eighth Amendment. *Farmer*, 511 U.S. at 834. As the Supreme Court has explained, "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Federal courts of appeals have held that suicide and self-harm are also sufficiently serious to satisfy the Eighth Amendment's objective element. *See, e.g.*, *Cope v. Cogdill*, 3 F.4th 198, 206 (5th Cir. 2021); *Comstock v. McCrary*, 273 F.3d 693, 703-04 (6th Cir. 2001); *Est. of Miller ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012); *Disability Rts. Mont., Inc. v. Batista*, 930 F.3d 1090, 1098 (9th Cir. 2019); *Est. of Burgaz ex rel. Zommer v. Bd. of Cnty. Comm'rs*, 30 F.4th 1181, 1186 (10th Cir. 2022).

The district court did not clearly err in finding, based on the record in this case, that Plaintiffs, transgender women previously individually assessed and placed in women's facilities, were likely to succeed in showing that they would be exposed to a substantial risk of serious harm if transferred to men's prisons. This is especially true given the paucity of the evidence submitted by the Government. Instead of addressing Plaintiffs' individual circumstances, the Government's evidence consisted mainly of generalized statistics about overall rates of assault in

women's BOP facilities compared to rates of assault in men's BOP facilities. *See, e.g.*, JA658–59 ¶¶ 19–23; *see also* AOB at 36–39 (reiterating this evidence). But as the district court rightly found, the Government's "statistics do not disaggregate assaults against transgender inmates from overall rates of assault" and "are still consistent with the 'numerous government reports and regulations recognizing that transgender persons are at significantly elevated risk of physical and sexual violence,'" JA187, as well as the record evidence that Plaintiffs' individual circumstances make them even more vulnerable. The district court did not clearly err by concluding that it was "unconvinced by the Government's proffered statistics." *Id.*

Nor can the Government "minimize any risk to plaintiffs by, among other things, transferring them to low-security institutions with non-violent offenders." AOB at 49–50. The Government again ignores the specific risks these transgender women would face in men's facilities given their prior classification as women and their housing in women's facilities, medical histories, and past experiences of sexual assault in men's facilities. As described above, multiple Plaintiffs have been assaulted by men in minimum-security men's facilities, and others faced pervasive sexual harassment in low-security men's prisons. *See supra* at 9, 13. In addition, if reclassified and transferred, nothing restricts BOP from moving any Plaintiff to a men's facility with a different security designation.

The Government also did not contest Plaintiffs' evidence that "forcing a transgender woman to reside in a men's facility … will predictably worsen gender dysphoria and cause severe psychological distress," and that this harm will be especially acute for individuals who have "lived in a sex different than their birth sex for a significant amount of time, including through use of medications and surgeries." JA313, 753 ¶ 5; *accord, e.g.*, JA86 ¶ 12; JA382 ¶ 14; JA922 ¶¶ 8, 10; JA935 ¶ 12 (Plaintiffs' declarations attesting to their fears that their gender dysphoria will worsen). The district court therefore did not clearly err when it found that "placement in a male penitentiary *by itself* will exacerbate the symptoms of [Plaintiffs'] gender dysphoria." JA187. Plaintiffs' histories of self-injury, self-surgery, and suicidal ideation in men's prisons show that this worsening gender dysphoria would put them at significant risk of harm. *See, e.g.*, JA815 ¶ 5.[15]

### 2. Defendants Knew of and Disregarded These Substantial Risks.

The district court also did not clearly err in finding that the Government knew of and disregarded these substantial risks when it decided to transfer Plaintiffs to men's prisons regardless of their individual vulnerabilities. As the

---

[15] Defendants suggest Plaintiffs did not assert these harms below. AOB at 40. But Plaintiffs set forth and relied on these harms in their initial and amended complaint, *e.g.*, JA191 ¶ 5; JA259 ¶ 7, in declarations by Plaintiffs and experts, *e.g.*, JA86 ¶ 12; JA753 ¶ 5, and in multiple rounds of briefing, *e.g.*, *Doe v. Bondi*, ECF No. 50-1 at 6; *Jones v. Trump*, ECF No. 21-1 at 6; *Moe v. Bondi*, ECF No. 31-1 at 4.

district court found, the Government did not "dispute the plaintiffs' allegations that BOP is subjectively aware that transferring the plaintiffs to a male penitentiary would substantially increase the likelihood of them experiencing [a] parade of harms" including sexual assault and worsening gender dysphoria.  JA165.  The Government has never claimed that BOP is unaware of any of the salient facts about Plaintiffs' histories of assault and abuse in men's prisons, their surgical and medical treatment, or the other evidence that shows Plaintiffs' likelihood of serious harm if transferred to men's facilities.

Indeed, in previously deciding that Plaintiffs needed to be housed in women's facilities, BOP determined that placement in a women's facility "would ensure [their] health and safety."  28 C.F.R. § 115.42(c).  BOP is also obligated by PREA regulations to consider Plaintiffs' specific vulnerabilities and previous experiences of sexual victimization.  *Id.* § 115.41(d)(1)–(9).  BOP's determinations that Plaintiffs were among the 1% of transgender women who should be housed in women's facilities shows that BOP was aware of the risks Plaintiffs would face in men's prisons.

Moreover, BOP's own statistics show that Plaintiffs are uniquely at risk within an already high-risk population.  The most recently available government-collected data shows that transgender incarcerated people experience about 10 times the rate of sexual victimization compared to the general population.  Bureau

of Just. Stats., U.S. Dep't of Just., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Tables*, at 2 tbl. 1 (2014), https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf (showing sexual victimization rates for transgender incarcerated people at 39.9% from 2011 to 2012); Bureau of Just. Stats., U.S. Dep't of Just., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, at 6 (2014) (estimating sexual victimization rates for the general prison population at 4.0% during the same period). "The vulnerability of transgender prisoners to sexual abuse is no secret." *Zollicoffer*, 169 F. Supp. 3d at 691. The heightened risk transgender women face in men's prisons is widely acknowledged by federal courts. *See supra* n.14.

The Government argues it did not act with deliberate indifference because BOP considered the risks to Plaintiffs when it decided *which* men's prison it would transfer them to. AOB at 42–43. But the Government's choice not to place Plaintiffs in the most dangerous men's prisons does not cure its deliberate indifference. *Cf. Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (holding that the Eighth Amendment does not require further proof of "some arbitrary quantity of injury" once elements of violation are established).

The Government also argues that its prior placement of Plaintiffs in women's facilities was "not based solely on safety considerations." AOB at 46. But the Government does not dispute that it assessed Plaintiffs' "vulnerability to

sexual victimization" and their medical and mental health needs when it decided that *these* individuals needed to be housed in women's prisons. *See id.* Those assessments put BOP on notice of Plaintiffs' specific histories and vulnerabilities to serious harm in men's facilities, including the fact that many Plaintiffs have been physically and sexually assaulted in men's facilities before. *See* 28 C.F.R. §§ 115.41(d), 115.42(c) (requiring BOP to consider past experiences of "sexual victimization" in determining housing placements and to "ensure" a transgender person's "health and safety" in determining whether to place them in a men's or women's facility); *see also id.* § 115.42(e) (requiring BOP to give "serious consideration" to a transgender person's "own views with respect to his or her safety" in determining housing placements). The Government's *post hoc* claim that it also considered other information does not erase BOP's knowledge that Plaintiffs would be at excessive risk of harm in men's prisons.

Finally, the Government claims that the deliberate indifference cases Plaintiffs cited below are inapposite because "[i]n each case, the court found that additional, case-specific factors heightened the risk of assault." AOB at 45. The Government misunderstands Plaintiffs' claim, as demonstrated by its attempt to distinguish Plaintiffs' cases.

Plaintiffs have never argued, and the district court has not concluded, that all transgender women must be housed in women's prisons to comply with the Eighth

Amendment. Instead, there are "additional, case-specific factors" showing that Plaintiffs—the tiny group of transgender women whom BOP previously determined needed to be housed in women's facilities—would be at heightened risk of assault and self-harm if placed in men's prisons. *Id.* These factors include Plaintiffs' history of victimization—as in *Zollicoffer*, 169 F. Supp. 3d at 689–90 and *Stover v. Corrs. Corp. of Am.*, No. 12-cv-393, 2015 WL 874288, at *7 (D. Idaho Feb. 27, 2015)—and their medical treatment that has caused them to develop female sex characteristics—as in *Doe*, 215 F. Supp. 3d at 65 and *Lojan*, 2013 WL 411356, at *1, 4. The Government knows of the specific, serious risks Plaintiffs would face in men's prisons and has chosen to disregard those risks to comply with the Executive Order. Nothing more is required to prove Plaintiffs' Eighth Amendment claim. *Farmer*, 511 U.S. at 837.[16]

## B. Plaintiffs Are Also Likely to Prevail on Their Claims Under the Administrative Procedure Act.

This Court "review[s] the district court's judgment, not its reasoning," and "may affirm on any ground properly raised." *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009). Plaintiffs argued below that BOP's implementation of EO

---

[16] To the extent the Government suggests that BOP has unfettered discretion to reweigh policy priorities affecting housing assignments, *see* AOB at 47–48, that cannot justify its disregard of the known and substantial risks of serious harm to Plaintiffs. Although BOP has significant discretion to set prison housing policy, it still must comply with the Constitution.

14168 violates the APA, 5 U.S.C. § 706(2), because it is arbitrary and capricious, not in accordance with law, and revokes PREA regulations without following the procedures necessary to amend or rescind those regulations. *See, e.g.*, *Doe v. Bondi*, ECF No. 81-1 at 8; ECF No. 50-1 at 19–23. Agency actions implementing an executive order are subject to APA review. *See, e.g.*, *Nebraska v. Su*, 121 F.4th 1, 15–16 (9th Cir. 2024); *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

BOP's decision to transfer Plaintiffs to men's prisons in compliance with EO 14168 is a final agency action. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *see also* AOB at 12–13 (acknowledging that BOP decided to transfer Plaintiffs and told Plaintiffs they would be transferred).

### 1. Defendants' Implementation of the Executive Order Violates Notice and Comment Requirements

PREA regulations have long required BOP to make individualized determinations, considering both men's and women's facilities, about where to house transgender individuals. *See* 28 C.F.R. § 115.42(c). These regulations were promulgated through notice and comment rulemaking. *See* National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106, 37204 (June 20, 2012); *see also* 5 U.S.C. § 553.

The APA requires agencies to "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg.*

*Bankers Ass'n*, 575 U.S. 92, 101 (2015).  As this Court has explained, "'an agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked' and 'may not alter [such a rule] without notice and comment.'"  *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (per curiam) (alteration in original) (quoting *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992)).

BOP's implementation of the Executive Order would repeal PREA regulations without following the necessary notice and comment procedures.  The order instructs BOP to ensure that all transgender women in federal custody "are not detained in women's prisons or housed in women's detention centers," regardless of their individual circumstances.  EO 14168 § 4(a).  This is directly contrary to PREA regulations that require BOP to make "case-by-case" determinations about "whether to assign a transgender or intersex inmate to a facility for male or female inmates" based on "the inmate's health and safety, and whether the placement would present management or security problems."  28 C.F.R. § 115.42(c).

Requiring "notice and comment before repeal of a final rule 'ensures that an agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal.'"  *Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*, 41 F.4th 564, 568 (D.C. Cir. 2022)

(quoting *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982)). For that reason, this Court has carefully scrutinized agency efforts to "effectively amend or withdraw the legal force of a rule without undergoing a new notice-and-comment rulemaking." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 23 (D.C. Cir. 2019). An agency may not take action that "effectively repeal[s] a final rule while sidestepping the statutorily mandated process for revising or repealing that rule on the merits." *Air All. Houston v. EPA*, 906 F.3d 1049, 1065 (D.C. Cir. 2018). Nor may it "substantively alter[]" the requirements of the rule without following appropriate procedures for the rule's amendment or repeal. *Liquid Energy Pipeline Ass'n v. FERC*, 109 F.4th 543, 548 (D.C. Cir. 2024); *see also NRDC v. EPA*, 643 F.3d 311, 320–21 (D.C. Cir. 2011).

These concerns are especially acute here. It took more than eight years after the enactment of PREA in 2003 to finalize the regulations that the Executive Order unravels. The housing requirements of the regulations reflect a deliberate balancing of the interests of prison administrators and the needs of incarcerated transgender people. BOP may not "simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). BOP's choice to "depart from a prior policy *sub silentio*" violates its procedural obligations under the APA. *Id.*

## 2. BOP's Action is Arbitrary and Capricious and Not in Accordance with Law.

BOP's implementation of the Executive Order is also arbitrary and capricious and not in accordance with law. *See* 5 U.S.C. § 706(2)(A). BOP has provided no reasoned explanation for its new policy that categorically forbids Plaintiffs from ever being housed in their current facilities or other women's facilities—facilities to which BOP assigned Plaintiffs based on individualized determinations, *see* 28 C.F.R. § 115.42, and in which Plaintiffs have been housed for months or years.

The APA requires agencies "to engage in reasoned decisionmaking" through a "logical and rational" process. *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs*, 496 F. Supp. 3d 31, 70 (D.D.C. 2020) (quoting *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) and *Allentown Mack Sales & Servs., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). When an agency departs from prior policy, it must show "that there are good reasons for [the new policy], and that the agency believes it to be better." *Fox Television Stations*, 556 U.S. at 515. The agency cannot disregard the facts and circumstances that formed the basis of the prior policy without providing "a reasoned explanation." *Id.* And an agency's decision is arbitrary or capricious if it "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

BOP failed to meet the requirements for reasoned decisionmaking, as it admits its decision started and ended with the Executive Order. Responding to Plaintiffs' APA claim before the district court, the Government failed to offer any justification independent of the Executive Order. Instead, the Government stated only that "[t]he Executive Order has articulated why the Executive has changed its policy." Defs' Resp. to Pls.' Mot. for TRO, *Doe v. Bondi*, ECF 53-1 at 36; Defs' Resp. to Pls.' Mot. for TRO, *Jones v. Trump*, ECF 24 at 34.

But an "executive order does not exempt [an agency] from basic APA requirements of reasoned decisionmaking." *Su*, 121 F.4th at 15; *see also AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 766 F. Supp. 3d 74, 83 (D.D.C. 2025). Indeed, courts considering agency action taken pursuant to *this* Executive Order (No. 14168) have already held it arbitrary and capricious when the agency's justification was the Executive Order. *See Orr v. Trump*, — F. Supp. 3d —, 2025 WL 1145271, at *19 (D. Mass. Apr. 18, 2025); *Kingdom v. Trump*, No. 1:25-cv-00691-RCL, 2025 WL 1568238, at *9–10 (D.D.C. June 3, 2025). *Orr* considered a new State Department passport policy, the record of which revealed "that the State Department considered virtually nothing aside from the Executive Order's directive when it developed the [new] [p]olicy." *Orr*, 2025 WL 1145271 at *18–19 (observing that the Department made no factual findings and did not explain why facts supporting prior policy "no longer carry weight"). Just so here: the

Executive Order constitutes BOP's only justification for its new policy.[17]

BOP has thus failed to provide "a satisfactory explanation for its action." *State Farm*, 463 U.S. at 43. Plaintiffs' current housing designations are the result of individualized determinations pursuant to 28 C.F.R. § 115.42 to "ensure the inmate's health and safety." Mandating that BOP *disregard* those safety determinations is not rational, and the Order provides no explanation to reconcile the apparent conflict. The Executive Order "entirely fail[s] to consider an important aspect of the problem": the extreme risks of rape, sexual and physical violence, and self-harm that Plaintiffs will face if transferred to men's facilities. *State Farm*, 463 U.S. at 43. Put differently, the Executive Order entirely ignores the people who will be transferred and the known dangers those transfers pose. "To be sure, agency action is not arbitrary and capricious merely because it is bad for some identifiable population," but "the APA *does* require an agency to take

---

[17] The administrative record for APA claims consists exclusively of the record the agency made *before* it acted. *AT&T Info. Sys., Inc. v. Gen. Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) (per curiam) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). Courts "bar introduction of litigation affidavits" that "offer post-hoc rationalizations" when the contemporaneous record revealed "no rationalization at the agency level." *Id.* The government endorsed this position when defending a different agency action taken to comply with Executive Order 14168. *See* Defs.' Opp. to Pls.' Mot. to Stay Agency Action and for PI, *Orr v. Trump*, No. 1:25-CV-10313-JEK, ECF No. 53 at 15 (D. Mass. March 12, 2025). The declarations of Rick Stover submitted to the District Court are thus not proper subjects of consideration for Plaintiffs' APA claim.

actions that are rationally and demonstrably related to its stated goals, … and give consideration to the reliance interests of those who may be harmed by a new policy." *Kingdom*, 2025 WL 1568238, at *10. Because the Executive Order falls short of *Fox Television Stations*' and *State Farm*'s requirements, it cannot save BOP's otherwise unsupported arbitrary and capricious action.

BOP's implementation of the Executive Order is also arbitrary and capricious or "otherwise not in accordance with law," 5 U.S.C. § 706(A)(2), because it directly violates the PREA regulations' requirement that BOP conduct individualized assessments when determining whether to house transgender people in men's or women's facilities. *See* 28 C.F.R. § 115.42(c); *Williams v. Kincaid*, 45 F.4th 759, 778 (4th Cir. 2022) (holding that a categorical approach to housing decisions "flouts the case-by-case analysis federal law requires"); *see generally United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (establishing that agencies must follow their own regulations).[18]

The Government also acts in an arbitrary and capricious manner when it acts based on animus. *Robbins v. Reagan*, 780 F.2d 37, 50 n.20 (D.C. Cir. 1985). Animus may take the form of a "desire to harm a politically unpopular group,"

---

[18] *Accardi* claims can be brought through an APA cause of action. *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 335–36 (D.D.C. 2018); *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020).

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), or it may reflect "negative attitudes," "fear," or "irrational prejudice," *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985).

The text and sweeping scope of the Executive Order demonstrate animosity against transgender people. It makes it the official "policy of the United States" to purposefully exclude transgender people from any legal recognition or protection. EO 14168 §§ 2, 2(a). It defines "gender ideology" as "permitting the false claim that males can identify as and thus become women and vice versa"; orders all agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology"; and orders agencies to "end the Federal funding of gender ideology." EO 14168 §§ 2(g), 3(e); *see also id.* § 3(g).

In short, the Executive Order declares a federal policy of denying the existence of transgender people. *See Orr*, 2025 WL 1145271, at *19 ("[T]he language of the Executive Order is candid in its rejection of the identity of an entire group—transgender Americans."); *S.F. A.I.D.S. Found. v. Trump*, No. 25-cv-01824-JST, 2025 WL 1621636, at *14–15 (N.D. Cal. June 9, 2025) (similar). The "principal purpose and the necessary effect" of the Order is to "demean those persons who are" transgender. *United States v. Windsor*, 570 U.S. 744, 774 (2013). Although the Executive Order sets out other alleged purposes—promoting

women's "dignity, safety, and well-being"; advancing "scientific inquiry, public safety, morale, and trust in government"; and "protect[ing] freedom of conscience"—the "sheer breadth" of the Order "is so discontinuous" with these purposes that it can only be explained by animus. *Romer v. Evans*, 517 U.S. 620, 632 (1996).

The Government's broader attack on transgender people removes any doubt that animus is the principal driver of the Government's challenged housing policy. The President has issued Executive Orders designed to strip protections from transgender people across multiple domains. *See supra* n.8 (listing Executive Orders). "Although aimed at different policy goals," each of the above-mentioned Executive Orders, "in tone and language, conveys a fundamental moral disapproval of transgender Americans." *Orr*, 2025 WL 1145271, at *14. The Executive Orders, including EO 14168, attack transgender people "not to further a proper [governmental] end but to make them unequal to everyone else." *Romer*, 517 U.S. at 635. The Government's policy is borne of animus and thus is necessarily arbitrary and capricious.

### C. Plaintiffs' Claims are Not Barred by the PLRA Or Any Other Statute.

#### 1. 18 U.S.C. § 3621(b) Does Not Bar Judicial Review.

Section 3621(b) does not bar Plaintiffs' challenges to BOP's categorical policy implementing the Executive Order. The statute prohibits judicial review of

"a *designation* of a place of imprisonment *under this subsection*." 18 U.S.C.

§ 3621(b) (emphasis added). BOP's transfer of Plaintiffs from women's facilities

was not an individualized placement decision under § 3621(b). BOP transferred

Plaintiffs pursuant to a categorical policy mandated by the Executive Order, not

based on the factors in § 3621(b). *See* EO 14168, § 4(a); AOB at 1, 12.

Accordingly, because BOP's actions fall outside § 3621(b)'s scope, the statute's

bar of judicial review does not apply.

In addition, as the district court correctly held, § 3621(b) does not preclude

judicial review of Plaintiffs' constitutional claims. JA160. "[W]here Congress

intends to preclude judicial review of constitutional claims its intent to do so must

be clear … to avoid the 'serious constitutional question' that would arise if a

federal statute were construed to deny any judicial forum for a colorable

constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (quoting *Bowen

v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986)). Congress did

not do so in § 3621.[19]

---

[19] *McBryde v. Comm. to Review Cir. Council Conduct*, 264 F.3d 52, 58, 60 (D.C. Cir. 2001) does not support the Government's argument. In *McBryde*, this Court found clear and convincing evidence that Congress intended to deny judicial review of judicial disciplinary proceedings. *Id.* at 62–63. None of the unusual factors the Court relied on to reach its conclusion apply here. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F. 3d 296, 309–10 (D.C. Cir. 2014) (describing the unique statutory language and legislative history relied on by this Court in *McBryde*).

The cases cited by the Government are inapposite because they all involved individualized placement decisions. *See Wills v. Barnhardt*, No. 21-1383, 2022 WL 4481492, at *1 (10th Cir. Sept. 27, 2022) (declining to review BOP's decision on plaintiff's transfer request); *Touizer v. U.S. Att'y Gen.*, No. 21-10761, 2021 WL 3829618, at *1–2 (11th Cir. Aug. 27, 2021) (per curiam) (rejecting plaintiff's request for home confinement); *Jiau v. Tews*, 812 F. App'x 638, 639 (9th Cir. 2020) (rejecting plaintiff's claims to the extent they challenged her placement in a prison rather than a residential re-entry center).

Moreover, the Supreme Court has held that a provision limiting judicial review of individual agency decisions does not preclude judicial review of statutory or constitutional challenges to blanket policies. *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991) (holding that a provision like § 3621(b), which limited judicial review of individual amnesty applications by immigrants, did not bar pattern and practice challenges to the INS's processing of such applications); *see also, e.g.*, *Ahmad v. Jacquez*, 860 F. App'x 459, 462 (9th Cir. July 1, 2021) (stating that § 3621(b) strips jurisdiction over individual transfer decisions but "does not preclude review of all challenges that might implicate individual designation decisions," including challenges to generally applicable BOP policies (citing *McNary*, 498 U.S. at 492)). Like the analogous provision in *McNary*, the language of § 3621(b) refers to judicial review of individual decisions

rather than to general "challenges to unconstitutional practices and policies used by the agency" in making such decisions. 498 U.S. at 492. Plaintiffs here are not seeking review of individual placement decisions under § 3621(b) but rather of BOP's adoption of a blanket policy requiring their transfer to men's facilities regardless of their individual circumstances. As such, § 3621(b) does not bar judicial review of their claims.

### 2. Section 3625 Similarly Does Not Bar Plaintiffs' APA Claims.

Any argument that 18 U.S.C. § 3625 bars Plaintiffs' APA claims fails for the same reasons. That provision makes the APA inapplicable "to the making of any determination, decision, or order" under Title 18, Part II, Chapter 229, Subchapter C, of which the only relevant section is § 3621(b). 18 U.S.C. § 3625. "§ 3625 bars review of individualized housing determinations, not … a challenge to a broad policy that informs the designation decision." *Love v. Bureau of Prisons*, No. 24-CV-2571 (APM), 2025 WL 105845, at *11–12 (D.D.C. Jan. 15, 2025) (holding § 3625 "no bar to review" because "[p]laintiffs are not challenging their individual housing placements. They contest the BOP's alleged discriminatory treatment of [a subset of prisoners] in the decision-making process"); *see also Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76, 84 (D.D.C. 2006) (holding § 3625 no bar where plaintiff "challenges the rulemaking leading to the BOP policy that informed his confinement determination, rather than challenging the determination itself").

Multiple circuit courts have reached the same conclusion. *See Richmond v. Scibana*, 387 F.3d 602, 605 (7th Cir. 2004) (distinguishing between contesting a housing assignment and contesting "the rules that will be used to decide" that placement); *see also Martin v. Gerlinski*, 133 F.3d 1076, 1079 (8th Cir. 1998) (explaining that "§ 3625 does not divest this court of jurisdiction to review whether the BOP exceeded its statutory authority by categorically considering sentencing enhancement factors"); *Fristoe v. Thompson*, 144 F.3d 627, 630–31 (10th Cir. 1998) (holding that section 3625 did not prevent judicial review of a BOP rule affecting sentencing reduction).

It is also well settled that § 3625 does not bar judicial consideration of Plaintiffs' challenge to BOP's failure to comply with the rulemaking provisions of the APA. *E.g.*, 5 U.S.C. § 553. As both the statute's text and judicial decisions make clear, § 3625 does not apply to agency rulemaking. *See* 18 U.S.C. § 3625; *Martin*, 133 F.3d at 1079 ("[I]t is apparent" that § 3625 does not bar review of "rulemaking decisions.").

### 3. The District Court Correctly Found that No Administrative Remedy Was Available.

Failure to exhaust administrative remedies is an affirmative defense under the PLRA, *Jones v. Bock*, 549 U.S. 199, 215–16 (2007), which "the defendants have the burden of pleading and proving," *Chandler v. Fed. Bureau of Prisons*, 226 F. Supp. 3d 1, 6 (D.D.C. 2016). The Government cannot show that this

affirmative defense makes Plaintiffs unlikely to succeed on the merits because it concedes that BOP must implement the categorical policy mandated by the Executive Order without discretion to do otherwise. AOB at 32 (stating that "BOP lacks discretion to continue housing plaintiffs in female facilities under EO 14168").

An aggrieved incarcerated person "must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (citing 42 U.S.C. § 1997e(a)). A remedy is unavailable "where the relevant administrative procedure lacks authority to provide any relief." *Id.* at 643 (citing *Booth v. Churner*, 532 U.S. 731, 736 & n.4 (2001)). Such is the case when BOP acts pursuant to a mandatory directive that divests it of any authority to provide relief. *Kaemmerling v. Lappin*, 553 F.3d 669, 675 (D.C. Cir. 2008).

In *Kaemmerling*, petitioner sought injunctive relief against BOP's enforcement of a federal statute under which "BOP ha[d] no discretion not to collect [his] DNA, as the statute's mandatory language indicates and as the BOP conceded." *Id.* at 675. There was thus "no administrative process to exhaust." *Id.* Similarly, here, Plaintiffs seek injunctive relief against BOP's implementation of an executive order with mandatory language that requires BOP to transfer Plaintiffs from women's prisons, as BOP concedes. *See* AOB at 32; *see also* EO 14168, § 4(a).

Moreover, BOP staff told Plaintiffs it lacked authority to provide relief. JA494 ¶ 12 (Maria Moe "was told that [she] did not have an ability to challenge the transfer because it was required by Executive Order"); JA649 ¶¶ 13–14 (█████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ ""). The text of the Executive Order, BOP's interpretation of it, and BOP staff statements to Plaintiffs all point to the same conclusion: BOP's administrative process "operate[d] as a simple dead end—with officers unable … to provide any relief." *Ross*, 578 U.S. at 643.

The Government suggests that Plaintiffs should have exhausted administrative remedies anyway because BOP could have taken actions unrelated to the Executive Order to "protect [Plaintiffs'] safety," such as "changes to housing and programming assignments, and protective custody." AOB at 32. This contention ignores that Plaintiffs' complaint arises out of an Executive Order that BOP is required to implement. BOP's administrative process is not capable of changing the terms of the Order or overruling its mandates—just as the grievance process in *Kaemmerling* could not alter or invalidate the text of a binding federal statute, *see* 553 F.3d at 676 (emphasizing that the plaintiff was challenging "the enforceability of a statute rather than the prison's method of enforcement"). The Government also cites *Savage v. United States Department of Justice*, 91 F.4th 480

(D.C. Cir. 2024). But in that case, this Court held that administrative remedies were available to a plaintiff challenging the terms of an order issued by the Department of Justice, reasoning that the administrative process "ends with review by the Department of Justice, which has the authority to modify or rescind" the order. *Id.* at 484. Because BOP lacked that authority here, Plaintiffs faced "a dead end" in challenging the application of the Executive Order to them. *Ross*, 578 U.S. at 643.

Administrative remedies were unavailable in this case for another reason as well: Plaintiffs faced immediate danger and could not have received relief before being exposed to the substantial risk of serious harm posed by transfer. Some Plaintiffs were in fact transferred to men's facilities without time or opportunity to file a grievance. JA230, 233–34. Others were moved to segregated housing and told they would be transferred imminently. *See, e.g.*, JA86, 88, 493–94. Exhaustion is not required when the administrative process cannot possibly remedy the threatened harm in time. *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010) ("If a prisoner has been placed in imminent danger of serious physical injury by an act that violates his constitutional rights, administrative remedies that offer no possible relief in time to prevent the imminent danger from becoming an actual harm can't be thought available.").

## II. PLAINTIFFS HAVE MET ALL OTHER REQUIREMENTS FOR PRELIMINARY INJUNCTIVE RELIEF

The district court did not abuse its discretion in weighing the *Winter* factors, *see Winter*, 555 U.S. at 20, and concluding that Plaintiffs met their burden on the remaining prongs for a preliminary injunction.

### A. Plaintiffs Have Shown They Will Suffer Irreparable Harm if the Government Implements EO 14168 and Transfers them from Women's Prisons.

Plaintiffs must show that they "will likely suffer irreparable harm before the district court can resolve the merits of the case." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022) (citing *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018)). Here, Plaintiffs face irreparable harm arising out of the Government's implementation of Section 4(a) of EO 14168, including the violation of their Eighth Amendment rights and substantial risks of sexual violence and physical harm.

### 1. BOP's Prospective Violation of Plaintiffs' Eighth Amendment Rights Causes Irreparable Harm.

Plaintiffs satisfy the irreparable harm standard where, as here, they face imminent violation of their Eighth Amendment right to be free from cruel and unusual punishment. As the district court properly recognized, "a prospective violation of a constitutional right constitutes irreparable injury." JA166 (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). "Where a plaintiff requests injunctive relief … that, if completed could … alleviate harsh

conditions of confinement, the harm from detention surely cannot be remediated after the fact." *Ramirez v. U.S. Immigr. and Customs Enf't*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018).

### 2. BOP's Implementation of EO 14168 Exposes Plaintiffs to a High Risk of Sexual Violence and Other Serious Harms.

Plaintiffs face a substantial risk of irreparable bodily harm in the absence of injunctive relief. *See supra* Argument § I(A)(1). If Plaintiffs are transferred to men's prisons, they will likely face physical violence and sexual harassment. Multiple Plaintiffs were physically attacked and sexually harassed in men's prisons before they were placed in women's facilities. *See, e.g.*, JA374–75, 382, 385. And two of the Plaintiffs who were transferred from women's to men's facilities under EO 14168 both suffered immediate and pervasive sexual harassment in those men's facilities. JA230, 233–34.

In addition, Plaintiffs Maria Moe, Jane Jones, and Zoe, Rachel, Wendy and Sara Doe are at extremely high risk of assault in men's prisons because they have undergone surgical treatment and/or appear indistinguishable from other women. *See* JA286, 703–04, 903, 965, 996, 1000. All Plaintiffs have been on female hormones for years and live as women.

Finally, the likelihood of irreparable harm is supported by the Government's own data demonstrating an elevated risk for the transgender prisoner population, as well as the unrebutted declarations submitted by Plaintiffs and Plaintiffs' experts

showing that Plaintiffs are at particularly high risk. *See supra* Argument § I(A).

The district court also did not clearly err in finding that, given the individual histories and vulnerabilities identified by these plaintiffs, "placement in a male penitentiary *by itself* will exacerbate the symptoms of [Plaintiffs'] gender dysphoria, *even if* they are not subject to physical or sexual violence in their new facility … because the mere homogenous presence of men will cause uncomfortable dissonance." JA187 n.2. As the district court found, this worsening of gender dysphoria will expose Plaintiffs to a serious risk of harm if they are moved to men's prisons. *Id.*

Defendants' reliance on *Citizens for Responsibility and Ethics in Washington (CREW) v. Federal Election Commission*, 904 F.3d 1014 (D.C. Cir. 2018) is misplaced. In *CREW*, this Court found no irreparable harm existed where the plaintiff campaign donors failed to provide "actual evidence" that the FEC's new disclosure requirements had a "chilling effect" on their behavior or evidence of "any actual independent expenditures [they had] made this quarter" or were deterred from making. *Id.* at 1019. In contrast, here, Plaintiffs submitted more than 20 declarations from themselves and experts describing the harms they have already experienced in men's prisons in addition to the imminent and certain harm they will face if forced to live in men's prisons. *See* JA84, 91, 229, 232, 285, 292, 373, 377, 380, 384, 490, 915, 920, 925, 929, 934, 938, 942, 947, 951.

**B.      The Balance of Equities and Public Interest Weigh in Favor of Preliminary Injunctive Relief.**

When the party opposing a preliminary injunction is the Government, the final two prongs merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The district court did not abuse its discretion in concluding "the public interest in seeing the plaintiffs relocated *immediately* to male facilities is slight at best," whereas "[t]he plaintiffs' interests … are not abstract at all," as Plaintiffs face substantiated harms to their physical and psychological wellbeing if transferred under the challenged Executive Order. JA167. In addition, "enforcement of an unconstitutional law is always contrary to the public interest." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020).

The Government now makes blanket, unsupported assertions on appeal that the Plaintiffs endanger the safety of others at the women's prisons where they reside. AOB at 4. The Government did not submit any evidence to support this assertion in any of the six oppositions filed in response to the motions for TROs and PIs in the underlying cases. Nor is there any support for the suggestion that simply being transgender makes Plaintiffs a threat to women's safety, privacy, or dignity.

Likewise, the Government cannot show that the injunctions undermine the public interest by forcing BOP to keep in place a housing policy "that no longer reflects its current … thinking." AOB at 53. In arguing to the contrary, the

Government relies on *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021). But *MediNatura* is inapposite. In that case, this Court denied a preliminary injunction seeking to retain a thirty-year-old agency guidance document, where the change in policy followed a multi-year review process that reflected the agency's "current enforcement thinking" and involved scientific analysis and public input. *See id.* at 935–37, 945. In contrast, here, the Government has not provided any explanation or evidence to support the policy change other than the text of the Executive Order at issue. Nor could there be evidence-based decision making to support the abrupt policy change, which was issued on day one of the current presidential administration before any serious review of BOP policies and practices had been taken, and which explicitly contravenes PREA and its implementing regulations.

The Government's analogy to *Hatim v. Obama*, 760 F.3d 54 (D.C. Cir. 2014) to argue that that the injunctions "impermissibly interfere with the government's administration of its federal prisons and the execution of Executive Branch policy" also fails. AOB at 53. In *Hatim*, the plaintiffs did not challenge an Executive Order, but rather an on-the-ground policy change at a specific detention facility the Court found was "needed to preserve internal order and discipline and to maintain institutional security." *Hatim*, 760 F.3d at 59 (internal citations omitted). There are no such findings here. In fact, the injunctions restore, rather

than interfere with, BOP's discretion to determine housing placements as needed to "ensure health and safety" for people in custody and maintain "security" in federal prisons.  28 C.F.R. § 115.42(c).

Defendants' position that this Court should defer to unfettered executive power also fundamentally misunderstands constitutional separation of powers. The Constitution represents the outer limits of deference to the Executive Branch; where a likely constitutional violation has been shown, deference is neither warranted nor in the public interest.  *See Int'l Refugee Assistance Proj. v. Trump*, 857 F.3d 554, 603 (4th Cir. 2017) (en banc), *vacated on mootness grounds*, 583 U.S. 912 (2017) (explaining that "the issuance of a preliminary injunction which prevents [the government] from enforcing restrictions likely to be found unconstitutional" does not harm the government and likely "improve[s]" our system of government).

## III.  THE DISTRICT COURT'S ORDERS COMPLY WITH THE PRISON LITIGATION REFORM ACT

The operative preliminary injunctions contain ample PLRA findings and meet the requirements of the statute.  *See* 18 U.S.C. § 3626(a)(2).  Specifically, the court found that Plaintiffs are likely to succeed on the merits of their Eighth Amendment claim and that they will experience "serious and irreparable harm" if Defendants' implementation of the Executive Order proceeds; enjoining the application of the Order to Plaintiffs was therefore "necessary to correct the harm";

there was no less intrusive means of correcting the harm; and the injunction was narrowly drawn because it addressed only the specific harms to the individual Plaintiffs and did not extend to protect non-parties or enjoin other aspects of the EO 14168. JA955, 958, 961. The district court also found that the injunctions would not cause any "adverse impacts on public safety or the operation of the criminal justice system" because they simply maintained the status quo during the pendency of the litigation. JA955–56, 959, 961–62.

The district court's articulation of its findings was nothing like the "one-sentence, boilerplate paragraph" the Government points to from *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1278 (11th Cir. 2020). Nothing in the PLRA "suggest[s] that Congress intended a provision-by-provision explanation of a district court's findings," and there is no reason to "read such an obligation into the statute." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010); *see also Fields v. Smith*, 653 F.3d 550, 558 (7th Cir. 2011) (reaching same conclusion and collecting cases).

The Government spends one paragraph arguing that the PIs were not in fact necessary to avert the harm threatened by the Executive Order. AOB at 56–57. This Court reviews for clear error the district court's factual findings that the injunctions were necessary, narrowly tailored, and the least intrusive means of correcting the harm. *Brown v. Plata*, 563 U.S. 493, 541 (2011); *see also United*

*States v. Hinds Cnty. Bd. of Supervisors*, 128 F.4th 616, 626 (5th Cir. 2025);

*Armstrong v. Newsom*, 58 F.4th 1283, 1293 (9th Cir. 2023). As the district court explained, its findings were amply supported by the evidence that (1) transferring Plaintiffs to men's prisons would put them at a "significantly elevated risk of physical and sexual violence relative to other inmates," JA164; (2) moving Plaintiffs to men's prisons would "exacerbate the symptoms of their gender dysphoria," potentially causing "numerous and severe symptoms," JA165; (3) BOP had previously determined that "a women's facility was the appropriate placement for each named plaintiff" based on the constitutional and statutory factors that required it to consider Plaintiffs' risk of harm in men's prisons, JA186; and (4) the fact that Rachel and Ellen Doe were "abused at their new facilities" after their brief transfer to men's prisons could "only strengthen their claims of irreparable harm," JA241–42. The Government's cursory and unsupported argument that it is "self-evident" that less intrusive relief could avert the harm shows no clear error in these findings. AOB at 56–57.

/ / /

/ / /

/ / /

/ / /

/ / /

# CONCLUSION

For the foregoing reasons, the preliminary injunctions should be affirmed.

DATED: June 30, 2025        Respectfully submitted,

GLBTQ LEGAL ADVOCATES &
DEFENDERS
NATIONAL CENTER FOR LGBTQ RIGHTS
BROWN GOLDSTEIN & LEVY LLP
LOWENSTEIN SANDLER LLP
ROSEN BIEN GALVAN & GRUNFELD LLP


By: */s/ Kara Janssen*
     Kara Janssen

Attorneys for Plaintiffs-Appellees

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32 (a)(7)(B) because it contains 12,525 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Kara Janssen*

Kara Janssen

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Kara Janssen*
Kara Janssen

# ADDENDUM

# TABLE OF CONTENTS

**Page**

18 U.S.C. § 3621(b) .............................................................................................1

18 U.S.C. § 3625 ..................................................................................................3

18 U.S.C. § 3626(a)(1)-(2) ...................................................................................4

5 U.S.C. § 553 ......................................................................................................6

5 U.S.C. § 706 ......................................................................................................8

42 U.S.C. § 1997e(a) ............................................................................................9

28 C.F.R. § 115.41 .............................................................................................10

28 C.F.R. § 115.42 .............................................................................................12

# 18 U.S.C. § 3621(b)

## § 3621. Imprisonment of a convicted person

\* \* \*

    **(b) Place of imprisonment**.--The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons, place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence. The Bureau shall, subject to consideration of the factors described in the preceding sentence and the prisoner's preference for staying at his or her current facility or being transferred, transfer prisoners to facilities that are closer to the prisoner's primary residence even if the prisoner is already in a facility within 500 driving miles of that residence. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering--

    **(1)** the resources of the facility contemplated;

    **(2)** the nature and circumstances of the offense;

    **(3)** the history and characteristics of the prisoner;

    **(4)** any statement by the court that imposed the sentence--

        **(A)** concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

        **(B)** recommending a type of penal or correctional facility as appropriate; and

    **(5)** any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau

determines has a treatable condition of substance addiction or abuse. Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person. Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court.

\* \* \*

**18 U.S.C. § 3625**

## § 3625. Inapplicability of the Administrative Procedure Act

 The provisions of sections 554 and 555 and 701 through 706 of title 5, United States Code, do not apply to the making of any determination, decision, or order under this subchapter.

**18 U.S.C. § 3626(a)(1)-(2)**

**§ 3626. Appropriate remedies with respect to prison conditions**

**(a) Requirements for relief.--**

**(1) Prospective relief.—**

 **(A)** Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

 **(B)** The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless--

  **(i)** Federal law requires such relief to be ordered in violation of State or local law;

  **(ii)** the relief is necessary to correct the violation of a Federal right; and

  **(iii)** no other relief will correct the violation of the Federal right.

 **(C)** Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of prisons or the raising of taxes, or to repeal or detract from otherwise applicable limitations on the remedial powers of the courts.

**(2) Preliminary injunctive relief.**--In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days

after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

*  *  *

# 5 U.S.C. § 553

## § 553. Rule making

**(a)** This section applies, according to the provisions thereof, except to the extent that there is involved--

    **(1)** a military or foreign affairs function of the United States; or

    **(2)** a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

**(b)** General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include--

    **(1)** a statement of the time, place, and nature of public rule making proceedings;

    **(2)** reference to the legal authority under which the rule is proposed;

    **(3)** either the terms or substance of the proposed rule or a description of the subjects and issues involved; and

    **(4)** the Internet address of a summary of not more than 100 words in length of the proposed rule, in plain language, that shall be posted on the Internet website under section 206(d) of the E-Government Act of 2002 (44 U.S.C. 3501 note) (commonly known as regulations.gov).

Except when notice or hearing is required by statute, this subsection does not apply--

    **(A)** to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

    **(B)** when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

**(c)** After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a

concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

**(d)** The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except--

    **(1)** a substantive rule which grants or recognizes an exemption or relieves a restriction;

    **(2)** interpretative rules and statements of policy; or

    **(3)** as otherwise provided by the agency for good cause found and published with the rule.

**(e)** Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

# 5 U.S.C. § 706

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error

**42 U.S.C. § 1997e(a)**

**§ 1997e. Suits by prisoners**

**(a) Applicability of administrative remedies**

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

\* \* \*

**28 C.F.R. § 115.41**

**§ 115.41 Screening for risk of victimization and abusiveness.**

(a) All inmates shall be assessed during an intake screening and upon transfer to another facility for their risk of being sexually abused by other inmates or sexually abusive toward other inmates.

(b) Intake screening shall ordinarily take place within 72 hours of arrival at the facility.

(c) Such assessments shall be conducted using an objective screening instrument.

(d) The intake screening shall consider, at a minimum, the following criteria to assess inmates for risk of sexual victimization:

(1) Whether the inmate has a mental, physical, or developmental disability;

(2) The age of the inmate;

(3) The physical build of the inmate;

(4) Whether the inmate has previously been incarcerated;

(5) Whether the inmate's criminal history is exclusively nonviolent;

(6) Whether the inmate has prior convictions for sex offenses against an adult or child;

(7) Whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;

(8) Whether the inmate has previously experienced sexual victimization;

(9) The inmate's own perception of vulnerability; and

(10) Whether the inmate is detained solely for civil immigration purposes.

(e) The initial screening shall consider prior acts of sexual abuse, prior convictions for violent offenses, and history of prior institutional violence or sexual abuse, as known to the agency, in assessing inmates for risk of being sexually abusive.

(f) Within a set time period, not to exceed 30 days from the inmate's arrival at the facility, the facility will reassess the inmate's risk of victimization

or abusiveness based upon any additional, relevant information received by the facility since the intake screening.

(g) An inmate's risk level shall be reassessed when warranted due to a referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization or abusiveness.

(h) Inmates may not be disciplined for refusing to answer, or for not disclosing complete information in response to, questions asked pursuant to paragraphs (d)(1), (d)(7), (d)(8), or (d)(9) of this section.

(i) The agency shall implement appropriate controls on the dissemination within the facility of responses to questions asked pursuant to this standard in order to ensure that sensitive information is not exploited to the inmate's detriment by staff or other inmates.

**28 C.F.R. § 115.42**

**§ 115.42 Use of screening information.**

(a) The agency shall use information from the risk screening required by § 115.41 to inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive.

(b) The agency shall make individualized determinations about how to ensure the safety of each inmate.

(c) In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.

(d) Placement and programming assignments for each transgender or intersex inmate shall be reassessed at least twice each year to review any threats to safety experienced by the inmate.

(e) A transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration.

(f) Transgender and intersex inmates shall be given the opportunity to shower separately from other inmates.

(g) The agency shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates.