## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

JANE DOE, et al.,

*Plaintiffs-Appellees,*

v.

PAMELA BONDI, in her official capacity as Attorney General
of the United States, et al.,

*Defendants-Appellants.*

JANE JONES, et al.,

*Plaintiffs-Appellees,*

v.

PAMELA BONDI, in her official capacity as Attorney General
of the United States, et al.,

*Defendants-Appellants.*

MARIA MOE,

*Plaintiff-Appellee,*

v.

DONALD J. TRUMP, in his official capacity as President
of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia

## AMICUS BRIEF OF MASSACHUSETTS and 12 OTHER STATES, IN SUPPORT OF APPELLEES

ANDREA JOY CAMPBELL
ATTORNEY GENERAL OF
MASSACHUSETTS

ELIZABETH MATOS
 Chief, Civil Rights Division

HELLE SACHSE
  Deputy Director
  Police Accountability Unit

BRETT GANNON
  Assistant Attorney General
  Civil Rights Division

One Ashburton Place, 4th Floor
Boston, MA 02108
Telephone: (617) 963-2313
E-mail:  Elizabeth.Matos@mass.gov

*Counsel for Commonwealth of Massachusetts*

**Related Cases**

This case has not previously been before this Court. Counsel is aware

of one related case within the meaning of D.C. Circuit Rule 28(a)(1)(C):

*Kingdom v. Trump*, No. 1:25-cv-691 (D.D.C.).

# TABLE OF CONTENTS

STATEMENT OF INTEREST ..................................................................... 1

ARGUMENT ........................................................................................ 2

I.  PREA's Protections are Essential to the Safety and Security of
    Transgender Individuals and to the Prison Population as a Whole.
        2

    A.  PREA's protections improve the safety and well-being of
        all those who live and work in prisons ................................ 2

    B.  PREA's implementing regulations improve the safety and
        well-being of transgender individuals specifically. ............ 5

        i.   Individualized housing determinations for
             transgender incarcerated individuals under PREA
             regulations are an important tool in preventing
             sexual assault. ........................................................ 5

        ii.  Making individualized housing determinations for
             transgender incarcerated individuals improves the
             overall safety and well-being of incarcerated
             individuals ............................................................... 9

II. BOP's New Blanket Policy Decreases Public Safety Because It
    Eliminates Discretion and Violates PREA's Regulations ........... 11

    A.  Prison officials must have discretion when making housing
        determinations is necessary to ensure legal compliance with
        PREA and its regulations. ................................................ 11

    B.  Compliance with the PREA standards is necessary for
        public safety. .................................................................... 13

III. Amici States' Experiences Demonstrates that Individualized
     Housing Determinations Consistent with PREA are Effective in
     Furthering Public Safety Goals. .................................................. 15

    A.  Massachusetts State Laws and Policies ............................ 16

    B.  Other Amici States' Policies ............................................. 19

CONCLUSION ..................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Bell v. Wolfish*, 441 U.S. 520 (1979) ..................................................... 12, 13

*Doe v. Georgia Dep't of Corr.*, 730 F. Supp. 3d 1327 (N.D. GA. 2024)............... 10

*Does 8-10 v. Snyder*, 945 F.3d 951 (6th Cir. 2019)................................................. 3

*Farmer v. Brennan*, 511 U.S. 825 (1994)..................................................... 3, 12, 13

*Hicklin v. Precynthe*, 2018 WL 806764 (E.D. MO. Feb. 9, 2018)......................... 10

*Hudson v. Palmer*, 468 U.S. 517 (1984)............................................................ 3, 13

*Konitzer v. Frank*, 711 F. Supp. 2d 874 (E.D. Wis. 2010) .................................... 10

*Rhodes v. Chapman*, 452 U.S. 337 (1981)......................................................... 4, 13

**Statutes**

18 U.S.C. § 4081 .................................................................................................... 12

34 U.S.C. § 30301(2) ............................................................................................... 3

34 U.S.C. § 30301(14)(B) ........................................................................................ 4

34 U.S.C. § 30301(15)(A) ........................................................................................ 5

34 U.S.C. § 30302(1) ............................................................................................... 1

34 U.S.C. § 30302(2)–(3) ......................................................................................... 2

34 U.S.C. § 30302(7) ............................................................................................... 3

34 U.S.C. §§ 30301-30309 ..................................................................................... 11

Cal. Penal Code § 2605(D) ..................................................................................... 21

Cal. Penal Code § 2606(A)(1) ................................................................................ 20

Cal. Penal Code § 2606(A)(2) ................................................................................ 20

Cal. Penal Code § 2606(A)(3) ................................................................................ 20

Cal. Penal Code § 2606(A)(4) ................................................................................ 21

Cal. Penal Code § 2606(B) ..................................................................................... 20

Cal. Penal Code § 2606(C) ........................................................................... 20

Mass. Gen. Laws ch. 127, § 32a ................................................................. 17

Mass. Gen. Laws ch. 127, § 39a ................................................................. 16

**Rules**

Federal Rule of Appellate Procedure 29(A)(2) ............................................. 1

Federal Rule of Appellate Procedure 29(A)(5) ........................................... 25

**Regulations**

77 Fed. Reg. 30873 (May 17, 2012) ............................................................. 3

28 C.F.R. § 115.21 (2012) ............................................................................ 5

28 C.F.R. § 115.22 (2012) ............................................................................ 4

28 C.F.R. § 115.315(B) (2012) .................................................................... 7

28 C.F.R. § 115.342(C) (2012) .................................................................... 7

28 C.F.R. § 115.342(F) (2012) .................................................................... 7

28 C.F.R. § 115.342(G) (2012) ................................................................... 7

28 C.F.R. § 115.42 (2012) ............................................................................ 7

28 C.F.R. § 115.42(B) (2012) ........................................................... 7, 11, 13

28 C.F.R. § 115.42(E) ................................................................................. 14

28 C.F.R. §§ 115.41, 115.81 ...................................................................... 14

40 RCNY § 5-18(A) ................................................................................... 22

40 RCNY § 5-18(B)-(D) ............................................................................. 22

40 RCNY § 5-18(E) ................................................................................... 22

40 RCNY § 5-18 (2017) ............................................................................. 22

103 DOC 653 ............................................................................................. 18

## Other Authorities

Carla Aveledeo, *Ten Years Later, PREA Does Not Live Up to Its Goal: Amending the Statute to Reduce Discriminatory Violence Against Transgender Prisoners*,
27 Roger Williams U. L. Rev. 89 (2022) .................................................... 5, 8

Allen J. Beck, U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Tables—Prevalence of Sexual Victimization Among Transgender Adult Inmates* (2014),
https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf. ................................... 6

Kelsie Chesnut & Jennifer Peirce, Vera Ins. of Just., *Advancing Transgender Justice: Illuminating Trans Lives Behind and Beyond Bars* 44 (2024),
https://vera-institute.files.svdcdn.com/production/downloads/publications/advancing-transgender-justice.pdf.................................................................. 8

Kevin R. Corlew, *Congress Attempts to Shine a Light on a Dark Problem: An In-Depth Look at the Prison Rape Elimination Act*, 33 Am. J. Crim. L. 157, 163 (2006)................................................................................................... 4, 11

Jaclyn Diaz, *Federal Prisons Prep To Move Trans Inmates As Early As This Week*, NPR (February 25, 2025), https://www.npr.org/2025/02/21/nx-s1-5305282/trans-inmates-federal-prison-policy-transfers. .............................. 11

Jody L. Herman, et. al., Williams Ins., *Prevalence, Characteristics, and Sexual Victimization of Incarcerated Transgender People in the United States: Results from the National Inmate Survey (Nis-3)*,
https://williamsinstitute.law.ucla.edu/wp-content/uploads/trans-incarceration-violence-oct-2016.pdf (last visited June 30, 2025) .................. 5

Jaclyn M. W. Hughto et al., *Victimization Within and Beyond the Prison Walls: A Latent Profile Analysis of Transgender and Gender Diverse Adults*, 37 Journal of Interpersonal Violence Np23075, Np23078 (2022).................... 13

*Human Rights Watch*, *No Escape: Male Rape in U.S. Prisons* (2001)
http://www.hrw.org/reports/2001/prison/report.html ...................................... 3

Sandy E. James at al., Nat'l Ctr. For Transgender Equal., *The Report of The 2015 U.S. Transgender Survey* 191 (2016), https://transequality.org/sites/default/files/docs/usts/usts-full-report-dec17.pdf......................................................................................... 6

Newton E. Kendig et al., *Developing Correctional Policy, Practice, and Clinical Care Considerations for Incarcerated Transgender Patients Through Collaborative Stakeholder Engagement*, 25 J. Corr. Health Care 277, 280 (2019)...................................................................................................... 10

Elida Ledesma & Chandra L. Ford, *Health Implications of Housing Assignments for Incarcerated Transgender Women*, 110 Persps. Soc. Scis. 650, 652 (2020)..................................................................................................... 9

Nat'l PREA Res. Ctr., *Prison Rape Elimination Act: About,* *https://www.prearesourcecenter.org/about/prison-rape-elimination-act* (last visited June 30, 2025) .............................................................. 3, 6

*N.Y. State Dep't of Corr. Cmty. Supervision, Inmate Reception/Classification, Directive No. 4021 (Jan. 23, 2019)* .............................................. 22

Julia Oparah, *Feminism and the (Trans)Gender Entrapment of Gender Nonconforming Prisoners*, 18 UCLA Women's L. J. 239, 263-64 (2012) ...................................................................................................... 10

Permanent Subcomm. on Investigations, Comm. on Homeland Sec. & Gov't Affairs, 117th Cong., *Sexual Abuse of Female Inmates in Federal Prisons* (2022) ...................................................................................................... 15

*Senate Bill 132 FAQs, Cal. Dep't of Corr. and Rehab.,* *https://www.cdcr.ca.gov/prea/sb-132-faqs/*................................................. 21

*Prison Rape Elimination Act, Cal. Dep't of Corr. and Rehab.,* https://www.cdcr.ca.gov/prea/........................................................................ 21

Brenda V. Smith et al., *National Prison Rape Elimination Commission Report* 7
(2009), https://www.prearesourcecenter.org/sites/default/files/library/nprec-
final-
report.pdf..https://www.prearesourcecenter.org/sites/default/files/library/npr
ec-final-report.pdf.. ......................................................................................... 6

U.S. Department of Justice, Memorandum Re: Compliance with Executive Order
"Defending Women from Gender Ideology Extremism and Restoring
Biological Truth to the Federal Government," (February 21, 2025),
https://www.documentcloud.org/documents/25541413-eo-14166-
compliance-02-21-2025/. ............................................................................ 11

U.S. Commission on Civil Rights, *Women in Prison: Seeking Justice Behind Bars*
32-33 (2020). ............................................................................................. 15

Nancy Wolff et al., *Sexual Violence Inside Prisons: Rates of Victimization,* 83 J.
Urb. Health 835, 836 (2006)................................................................... 3, 15

# STATEMENT OF INTEREST

The Commonwealth of Massachusetts and the States of California, Illinois, New York, Rhode Island, Vermont, Maine, Maryland, Delaware, Minnesota, Oregon, Hawaii, and the District of Columbia (Amici States) submit this brief in support of Plaintiffs-Appellees pursuant to Federal Rule of Appellate Procedure 29(a)(2). Amici states, like all states, have a duty to keep all incarcerated people safe. That includes incarcerated people who are transgender. Amici states recognize that this population is especially vulnerable, and that policies and practices tailored to their specific needs are necessary to keep them safe from serious bodily harm. Amici States also have an interest in ensuring that the facilities that house them are safe, efficient, and secure.

To promote these interests, many states have adopted laws and policies to protect transgender people who are incarcerated. These laws and policies improve health outcomes for transgender incarcerated individuals, safeguard their physical, emotional, and psychological well-being, and help ensure that prisons are safe and secure. As relevant here, these laws and policies are consistent with, and further the goals of, the Prison Rape Elimination Act (PREA) of 2003, which "establish[es] a zero-tolerance standard for the incidence of prison rape in prisons in the United States," 34 U.S.C. § 30302(1), and makes the prevention of prison rape "a top priority" by developing and implementing national standards for the

detection, prevention, reduction, and punishment of prison rape. 34 U.S.C. §
30302(2)–(3).

The decision by the federal Bureau of Prisons (BOP) to remove all
discretion of correctional staff to house any transgender women in women's
prisons is inconsistent with PREA and its implementing regulations and with the
interests of Amici States, as stated above. Amici States urge this Court to affirm
the District Court's preliminary injunction.

## ARGUMENT

**I.     PREA's Protections are Essential to the Safety and Security of
         Transgender Individuals and to the Prison Population as a Whole.**

### A.     PREA's protections improve the safety and well-being of all those who live and work in prisons.

Congress enacted PREA to ensure that all incarcerated individuals, including
those who are transgender, are better protected in correctional facilities. PREA's
protections reduce the risk of sexual assault, promote the safety and security of
prisons housing transgender incarcerated individuals, improve the safety of those
transgender incarcerated individuals, and further the goal of effective prison
administration.

To address the troubling incidence of sexual assault in prisons,[1] Congress enacted PREA in 2003 "with the purpose of implementing standards and policies to prevent prison rape and to 'protect the Eighth Amendment rights of Federal, State, and local prisoners.'" *Does 8-10 v. Snyder*, 945 F.3d 951, 955–56 (6th Cir. 2019) (quoting 34 U.S.C. § 30302(7)). A report by Human Rights Watch[2] detailing the widespread nature of sexual violence behind bars served as Congress's primary impetus for PREA's enactment.[3] In the 20 years prior to PREA's enactment, over 1 million incarcerated individuals had been raped in correctional facilities in the United States. 34 U.S.C. § 30301(2).

PREA reflects the recognition that "[s]exual violence, against any victim, is an assault on human dignity and an affront to American Values."[4] This is consistent with the Supreme Court's recognition that sexual assault "serves no legitimate penological objective. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 548 (1984)). "Being violently assaulted

---

[1] Nat'l PREA Res. Ctr., *Prison Rape Elimination Act: About*, https://www.prearesourcecenter.org/about/prison-rape-elimination-act (last visited June 30, 2025).

[2] Human Rights Watch, *No Escape: Male Rape in U.S. Prisons* (2001), http://www.hrw.org/reports/2001/prison/report.html

[3] Nancy Wolff et al., *Sexual Violence Inside Prisons: Rates of Victimization*, 83 J. Urb. Health 835, 836 (2006).

[4] Presidential Memorandum—Implementing the Prison Rape Elimination Act, 77 Fed. Reg. 30873 (May 17, 2012).

in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

In addition to protecting all incarcerated individuals, including transgender persons, from sexual assault in prison, PREA's protections improve facility safety as a whole. Indeed, in enacting PREA, Congress recognized that sexual violence within prison facilities "increases the levels of violence, directed at inmates and at staff, within prisons," 34 U.S.C. § 30301(14)(B), and increases the risk of "insurrections and riots," *id.* § 30301(10). Sexual violence is so destabilizing that even nonviolent individuals may be "forced to use violent methods to defend themselves," and are "more likely to turn to violence as a solution, even to resolve other problems, after being sexually assaulted."[5]

There are significant institutional costs associated with sexual violence. Prisons are required to have processes for investigating such incidents. 28 C.F.R. § 115.22 (2012). Typically, correctional staff, health care providers, and mental health workers are involved in investigating incidents and collecting required data.

---

[5] Kevin R. Corlew, *Congress Attempts to Shine a Light on a Dark Problem: An In-Depth Look at the Prison Rape Elimination Act*, 33 Am. J. Crim. L. 157, 163 (2006).

28 C.F.R. § 115.21 (2012).[6] Reducing violence, particularly sexual assault, allows them to pursue their primary responsibilities and reduces facility costs. Indeed, Congress explicitly recognized PREA's potential for reducing institutional costs when it enacted the law. 34 U.S.C. § 30301(15)(A).

**B. PREA's implementing regulations improve the safety and well-being of transgender individuals specifically.**

**i. Individualized housing determinations for transgender incarcerated individuals under PREA regulations are an important tool in preventing sexual assault.**

Unfortunately, the risk of sexual assault in prison for transgender individuals is much higher than non-transgender individuals. In the 2011–2012 National Inmate Survey, 37% of transgender incarcerated individuals reported being sexually victimized, compared to 3.4% of non-transgender individuals.[7] In 2014, the Department of Justice's Bureau of Justice Statistics reported that, in a weighted average of three surveys between 2007 and 2012, approximately 34% of transgender individuals in correctional and detention facilities had been sexually

---

[6] *See also* Carla Aveledeo, *Ten Years Later, PREA Does Not Live Up to Its Goal: Amending the Statute to Reduce Discriminatory Violence Against Transgender Prisoners*, 27 Roger Williams U. L. Rev. 89, 94 (2022).

[7] Jody L. Herman, et. al., Williams Ins., *Prevalence, Characteristics, and Sexual Victimization of Incarcerated Transgender People in the United States: Results from the National Inmate Survey (NIS-3)*, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Incarceration-Violence-Oct-2016.pdf (last visited June 30, 2025).

victimized.[8] In a 2015, one in five transgender respondents reported being sexually assaulted by either staff or other incarcerated individuals—a rate that is five to six times higher than the rate reported by the incarcerated population as a whole.[9] In the same survey, nearly one quarter of transgender incarcerated individuals who reported being physically assaulted said these incidents occurred eight or more times.[10] The National Prison Rape Elimination Commission, which was tasked under PREA with developing national standards to prevent, detect, and punish rape in prisons, recognized the heightened risks faced by transgender individuals.[11] The Commission noted in its final report, in January 2009, that "research on sexual abuse in correctional facilities consistently documents the vulnerability . . . of transgender individuals."[12] These findings led the Commission to draft standards to

---

[8] Allen J. Beck, U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Tables—Prevalence of Sexual Victimization Among Transgender Adult Inmates* (2014), https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf.

[9] Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 191 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

[10] *Id*.

[11] Nat'l PREA Res. Ctr., *Prison Rape Elimination Act: About*, https://www.prearesourcecenter.org/about/prison-rape-elimination-act (last visited June 30, 2025).

[12] Brenda V. Smith et al., *National Prison Rape Elimination Commission Report* 7 (2009), https://www.prearesourcecenter.org/sites/default/files/library/NPREC-Final-Report.PDF..

specifically address the safety needs of transgender individuals, including requiring prisons to make "individualized determinations" about appropriate housing placements.[13]

Based on these standards, the Department of Justice issued regulations in 2012 that outlined PREA standards for correctional facilities. They largely incorporated the Commission's recommendations on housing determinations for transgender individuals. 28 C.F.R. § 115.42 (2012). The standards address the unique vulnerabilities of those who do not conform to traditional gender expectations and specifically require prisons to determine "on a case-by-case basis" whether placing a transgender person in a particular facility and/or "making other housing and programming assignments…"would ensure the inmate's health and safety, and whether the placement would present management or security problems." 28 C.F.R. § 115.342(c) (2012). The standards further require that facilities give "serious consideration" to the transgender incarcerated individual's "own views with respect to his or her own safety." 28 C.F.R. § 115.342(f) (2012). And they impose additional measures to ensure safety, prohibiting opposite gender pat-down searches absent exigent circumstances, 28 C.F.R. § 115.315(b) (2012), and requiring that transgender individuals have the opportunity to shower separately from other incarcerated people. 28 C.F.R. § 115.342(g) (2012).

---

[13] *Id*. at 217; 28 C.F.R. § 115.42(b) (2012).

Critically, these PREA regulations reflect the reality that, because transgender individuals have a heightened risk of sexual assault, prison administrators must have discretion to implement measures designed to mitigate that risk, making thoughtful decisions on housing placement based on individualized determinations. These individualized housing determinations, which permit consideration of an individual's transgender status, are an effective preventative tool in maintaining order and safety in a facility.[14]

Although PREA has been a helpful tool in preventing and addressing sexual assault against transgender individuals in prisons, such violence persists today, underscoring the need to allow particularized protections for this vulnerable population. In a 2024 survey of then-currently incarcerated transgender individuals, 30% reported they experienced a nonconsensual sexual encounter in their current housing placement within the prison, while 53% reported this happened at some point during their sentence.[15] Twenty-two percent of transgender individuals also reported they are persistently concerned about their physical safety

---

[14] Carla Aveledeo, *Ten Years Later, PREA Does Not Live Up to Its Goal: Amending the Statute to Reduce Discriminatory Violence Against Transgender Prisoners*, 27 Roger Williams U. L. Rev. 89, 100 (2022).

[15] Kelsie Chesnut & Jennifer Peirce, Vera Ins. of Just., *Advancing Transgender Justice: Illuminating Trans Lives Behind and Beyond Bars* 44 (2024), https://vera-institute.files.svdcdn.com/production/downloads/publications/advancing-transgender-justice.pdf

because of harassment, threats, and violence,[16] Notably, and "nearly all transgender women respondents (95%) were housed in men's prisons at the time of the survey."[17]

### ii. Making individualized housing determinations for transgender incarcerated individuals improves the overall safety and well-being of incarcerated individuals.

Ensuring that PREA's protections are properly applied to transgender incarcerated individuals yields benefits beyond reducing sexual violence. In contrast, blanket policies that forbid officials from taking into account an incarcerated person's transgender status in contexts such as housing, searches, and showering may in and of themselves cause significant harm, including for those with gender dysphoria, a serious medical condition which, if not taken seriously, can lead to severe psychological distress resulting in depression, anxiety, suicidality, and even death.[18]

For some transgender women, placement in a men's housing unit can also exacerbate their gender dysphoria and, in turn, significantly increase the likelihood of prison staff needing to address a mental health or other crisis in the correctional

---

[16] *Id.* at 43-44.

[17] *Id.* at 26.

[18] Elida Ledesma & Chandra L. Ford, *Health Implications of Housing Assignments for Incarcerated Transgender Women*, 110 Persps. Soc. Scis. 650, 652 (2020).

environment.[19] Because of this, it is essential that correctional staff retain discretion to house transgender women based on individualized assessments. Such assessments can help assure that other routine procedures in correctional facilities, such as strip and pat searches, are conducted by appropriate staff.[20]

Indeed, researchers have found that where prisons implement policies and practices that protect transgender individuals—including implementing case-by-case housing determinations, referring to transgender women as women, and permitting transgender incarcerated individuals to access commissary items consistent with their gender and security classification—a "culture of safety" is created that promotes a sense of well-being for transgender individuals and helps protect them from abuse.[21] Personal forms of expression, like clothing, makeup, and hair products help people with gender dysphoria "consolidate an identity… that… causes them to feel comfortable and safe in this world." *Konitzer v. Frank*, 711 F. Supp. 2d 874, 890 (E.D. Wis. 2010) (quoting plaintiff's expert). *See also Hicklin v. Precynthe*, No. 4:16-CV-01357-NCC, 2018 WL 806764, at *12 (E.D. Mo. Feb. 9, 2018); *Doe v. Georgia Dep't of Corr.*, 730 F. Supp. 3d 1327, 1342

---

[19] *Id.*

[20] Julia Oparah, *Feminism and the (Trans)gender Entrapment of Gender Nonconforming Prisoners*, 18 UCLA Women's L. J. 239, 263-64 (2012).

[21] Newton E. Kendig et al., *Developing Correctional Policy, Practice, and Clinical Care Considerations for Incarcerated Transgender Patients Through Collaborative Stakeholder Engagement*, 25 J. Corr. Health Care 277, 280 (2019).

(N.D. Ga. 2024) (finding provision of cosmetic items to transgender individual to be "medically necessary"). In contrast, policies that undermine efforts to protect transgender individuals ultimately hinder the safe and efficient operation of prison facilities.[22]

## II. BOP's New Blanket Policy Decreases Public Safety Because It Eliminates Discretion and Violates PREA's Regulations.

### A. Prison officials must have discretion when making housing determinations to ensure legal compliance with PREA and its regulations.

BOP's policy categorically requires that all transgender women be moved out of women's prisons and into men's facilities.[23] This policy is fundamentally inconsistent with the case-by-case discretion required by PREA and its implementing regulations. *See* 34 U.S.C. §§ 30301-30309; 28 C.F.R. § 115.42(b) (2012). Moreover, it exacerbates the risk of sexual assault for transgender individuals because it strips facility administrators of the ability to make the kinds

---

[22] *See* Corlew, *supra* note 5, at 163.

[23] *See* Jaclyn Diaz, *Federal Prisons Prep To Move Trans Inmates As Early As This Week*, NPR (February 25, 2025), https://www.npr.org/2025/02/21/nx-s1-5305282/trans-inmates-federal-prison-policy-transfers; *see also* U.S. Department of Justice, Memorandum Re: Compliance with Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," (February 21, 2025), https://www.documentcloud.org/documents/25541413-eo-14166-compliance-02-21-2025/.

of individualized, fact-specific decisions that permit them to best guarantee the safety of both transgender incarcerated individuals and the facility as a whole.

Prison administrators have long employed individualized determinations to effectively manage correctional facilities. Since 1948, BOP has implemented an "individualized system of discipline, care, and treatment" of people committed to its institutions, utilizing a classification system—designating incarcerated individuals based on their offenses, character, mental condition, and other factors—intended to manage security risks and maintain the safety and security of detainees and staff. 18 U.S.C. § 4081. This approach is consistent with PREA and furthers the goal of protecting the rights, dignity and safety of transgender incarcerated individuals while maximizing facility security. BOP's policy of stripping facility administrators of discretion with respect to this discrete population, on the other hand, is inconsistent with the well-established practice of engaging in individualized determinations in other contexts and renders compliance with PREA's standards impossible.

Contrary to the argument made in the Amicus Brief filed by Indiana, Idaho, and other states in support of the Appellants, the cases *Farmer v. Brennan* and *Bell v. Wolfish* do not support judicial deference to a categorical ban on individualized assessments. Instead, they emphasize the importance of allowing prison officials to exercise discretion in addressing safety concerns and meeting constitutional and

statutory demands. *See Farmer*, 511 U.S. at 847; *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). While solutions to some matters of prison management are best left to those with on-the-ground expertise, "the issue of whether a particular system violates any prohibition of the Constitution or, in the case of a federal prison, a statute" is nonetheless left to the courts. *Bell*, 441 U.S. at 562. The Constitution "'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer*, 511 U.S. at 832 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

## B. Compliance with the PREA standards is necessary for public safety.

Transgender individuals, and especially transgender women, face disproportionately high rates of sexual violence in prison.[24] As discussed above, to effectuate PREA's goal to reduce sexual violence in prison, the national implementing regulations require "individualized determinations about how to ensure the safety of each inmate." 28 C.F.R. § 115.42(b).

Case-by-case housing assessments are among the "reasonable measures" prison officials take "to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). By denying prison

---

[24] Jaclyn M. W. Hughto et al., *Victimization Within and Beyond the Prison Walls: A Latent Profile Analysis of Transgender and Gender Diverse Adults*, 37 Journal of Interpersonal Violence NP23075, NP23078 (2022).

officials any discretion to make individualized placement decisions, the BOP's blanket policy prevents officials from carrying out their constitutional duty to protect transgender incarcerated individuals from a "substantial risk of serious harm." *Id*. at 847. As the lower court's decision correctly notes, this lack of discretion could result in successful challenges on Eighth Amendment grounds. *See* March 3, 2025, Decision at 4.

As the national PREA standards contemplate, individuals may present with any number of vulnerabilities, including past experiences of sexual assault in prisons, which must be considered in determining which placement would best ensure the health and safety of the individual. *See* 28 C.F.R. §§ 115.41, 115.81. Moreover, subsection (e) of Standard 115.42 states that the transgender or intersex individual's feelings about their own placement "*shall* be seriously considered." 28 C.F.R. § 115.42(e) (emphasis added). There is simply no way for Defendants to comply with PREA if officials are denied any discretion to house transgender women in women's facilities.

Defendants' change in policy is clearly driven not by changed circumstances, but by animus and bias against transgender prisoners, including the false assumption that housing transgender women in women's prisons necessarily poses a danger to other women in those facilities. In fact, maintaining correctional discretion to house transgender women in women's facilities when appropriate,

pursuant to individualized housing assessments *protects* the health and safety of other individuals housed in those facilities. BOP and Amici states, in fact, have policies in place to protect the privacy of all incarcerated people, including those in women's facilities.

As amply referenced above, transgender individuals experience a much greater risk to their health and safety when they are categorically denied placement in a facility consistent with their needs. Defendants' categorical ban on these placements is not based on these sound correctional practices and would knowingly place a subset of an already vulnerable population at a heightened risk of harm.[25] Individualized assessments, that account for transgender women's vulnerability to violence and other risk factors (in addition to many other correctional factors), are effective and vital to improving safety for the prison environment.

III. **Amici States' Experiences Demonstrates that Individualized Housing Determinations Consistent with PREA are Effective in Furthering Public Safety Goals.**

Many Amici States have enacted laws and regulations that reject a categorical approach to housing prisoners and instead allow transgender

---

[25] *See* Permanent Subcomm. On Investigations, Comm. on Homeland Sec. & Gov't Affairs, 117th Cong., *Sexual Abuse of Female Inmates in Federal Prisons* (2022); U.S. Commission on Civil Rights, *Women in Prison: Seeking Justice Behind Bars* 32-33 (2020); Nancy Wolff et al., *supra* note 3.
.

incarcerated individuals to be housed and searched based on individualized determinations. Such measures increase safety in prisons, promote compliance with PREA, allow for successful rehabilitation, and reflect the interests of Amici States in protecting the rights of all residents, including those who are incarcerated and most vulnerable.

### A. Massachusetts State Laws and Policies

**Massachusetts Criminal Justice Reform Act of 2018**

Massachusetts has a strong interest in ensuring that all residents of the Commonwealth are treated equally and fairly. This includes transgender individuals who are incarcerated.

In 2018, Massachusetts enacted, on a bipartisan basis, An Act Relative to Criminal Justice Reform ("the Act"). 2018 Mass. Acts ch. 69. The Act focused on a wide variety of criminal justice issues while paying particular attention to the rights of transgender individuals in Massachusetts correctional facilities.

As an initial matter, the Act prohibits officials at correctional facilities across the state, including in prisons and jails, from placing an individual in restrictive housing simply because that person has a gender identity or expression or sexual orientation uncommon in the general population. Mass. Gen. Laws ch. 127, § 39A (2018). This change addressed a common problem in correctional

facilities, where gender non-conforming individuals were frequently segregated from the general population, which was a danger to their health and safety

The Act also made sweeping changes to how transgender individuals are treated in correctional facilities. It requires correctional staff to address an individual based on their gender identity, mandates that invasive searches be completed by an officer of the same gender identity if so requested by the individual being searched, and instructs facilities to house transgender individuals with those of the same gender identity provided that it is consistent with the incarcerated person's request and would not otherwise be detrimental to the health and safety of the individual or pose management or security problems. Notably, the language of the Act makes clear that an individualized assessment is required Mass. Gen. Laws ch. 127, § 32A (2018).

The Act also included a forward-looking provision that established a special commission to study the health and safety of lesbian, gay, bisexual, transgender, queer, and intersex prisoners in correctional institutions, jails, and houses of correction, with the goal of evaluating access to appropriate healthcare services and health outcomes. 2018 Mass. Acts ch. 69, § 218(a). Among its recommendations, the special commission called for expanded access to HIV treatment and care, acknowledging that transgender individuals face a heightened risk of contracting HIV and other STIs while incarcerated. The commission also

highlighted the importance of housing transgender individuals in facilities that align with their gender identity, citing safety as the primary concern. 2018 Mass. Acts ch. 69, § 218(a). The commission was made up of advocates, Massachusetts Department of Correction ("MADOC") representatives, and law enforcement officials. 2018 Mass. Acts ch. 69, § 218(b).

Since the Act was passed, MADOC has committed to "appropriately manage gender non-conforming inmates in a humane, safe, correctional environment, sensitive to their unique adjustment issues" while also committing to "provide adequate medical care and mental health services to all inmates in its custody."[26]

When determining where a gender non-conforming person is housed, the MADOC makes decisions on a case-by-case basis and considers their stated request, their health and safety, as well as any security issues that may arise.[27] The MADOC then uses a risk factor assessment tool to determine the incarcerated person's likelihood of facing victimization, violence, predatory behavior, and abusiveness. The MADOC also reviews housing decisions at least twice a year to

---

[26] Massachusetts Department of Correction Policy 103 DOC 653, *Identification, Treatment and Correctional Management of Gender Non-Conforming Inmates*, eff. February 23, 2024, available at: https://www.mass.gov/doc/doc-653-identification-treatment-and-correctional-management-of-gender-non-conforming-inmates/download.

[27] *Id.*

address any threats to safety, at which time "a gender non-conforming inmate's own views with respect to their own safety shall be given serious consideration."[28]

## B. Other Amici States' Policies

**California**

In 2020, the California legislature passed "The Transgender Respect, Agency, and Dignity Act," Senate Bill 132 (hereafter SB 132).[29] The law was introduced to reduce the "significant risk of violence" and sexual victimization that transgender women face in men's facilities within the California Department of Corrections and Rehabilitation (CDCR).[30] In enacting SB 132, the California legislature specifically referenced PREA and its mandates to reduce or eliminate prison sexual assault, as well as PREA's standards regarding the housing of transgender incarcerated individuals.[31]

SB 132 mandates that housing placement and searches relating to transgender individuals are based on the individual's preference absent management or security concerns. The bill added Penal Code Sections 2605 and 2606, which effectuate the

---

[28] *Id.*

[29] S.B. 132, 2019-2020 Reg. Sess. (Cal. 2020) https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200SB132.

[30] Cal. Sen. Pub. Saf. Comm., Analysis of S.B. 132, 2019-2020 Reg. Sess., at 4 (2019), https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200SB132#..

[31] *Id.* at 8-9.

bill's four primary components. *First*, it directs that transgender individuals be housed in facilities that align with their gender identity, based on the individual's preference, Cal. Penal Code § 2606(a)(3), absent any management or security concerns with such housing placement, Cal. Penal Code § 2606(b). If there are such concerns, CDCR may deny the individual's housing preference in writing, detailing the specific and articulable basis why CDCR is unable to accommodate the housing preference. *Id.* However, CDCR cannot deny an individual's housing preference for any discriminatory reason, including because of their anatomy, sexual orientation, or any "factor present among other people incarcerated at the preferred type of facility." Cal. Penal Code § 2606(c). *Second*, SB 132 directs that individuals must be searched according to the search policy for their gender identity or according to the gender designation of the facility where they are housed, based on the individual's search preference, Cal. Penal Code § 2606(a)(2), absent management or safety concerns. Cal. Penal Code § 2606(b). If there are such concerns, CDCR must detail them in writing, identifying the specific and articulable basis why CDCR is unable to accommodate the search preference. *Id.* As with housing placement decisions, CDCR cannot deny an individual's search preference for any discriminatory reason, including because of their anatomy or sexual orientation. Cal. Penal Code § 2606(c). *Third*, the bill directs CDCR to address incarcerated persons "in a manner consistent with [their] gender identity,"

Cal. Penal Code § 2606(a)(1), and requires CDCR staff not to "consistently fail to use the gender pronoun and honorific an individual has specified" in verbal and written communications, Cal. Penal Code § 2605(d). *Fourth*, the bill requires CDCR to give an individual's "perception of health and safety" "serious consideration in any bed assignment, placement, or programming decision within the facility in which they are housed." Cal. Penal Code § 2606(a)(4).

CDCR incorporates individual's gender-based housing request into its existing case-by-case classification process.[32] This process includes a thorough review of the individual's criminal history, their behavior in prison, custody level, medical and mental health needs, programming needs, as well as an assessment of any safety and security concerns.[33] The overarching goal of effective placement is to provide for "safe living and working environments" for all incarcerated individuals, and CDCR recognizes that "PREA compliance is a significant factor in providing the necessary safety and security for successful rehabilitation."[34]

---

[32] *Senate Bill 132 FAQs*, Cal. Dep't of Corr. and Rehab., https://www.cdcr.ca.gov/prea/sb-132-faqs/.

[33] *Id.*

[34] *Prison Rape Elimination Act*, Cal. Dep't of Corr. and Rehab., https://www.cdcr.ca.gov/prea/.

**Other States Implementing PREA's Mandates**

Other Amici States likewise have written correctional policies that reflect the case-by-case approach to housing determinations for incarcerated transgender individuals outlined in the federal PREA standards. These policies protect the interests of Amici States in establishing correctional facilities that are safe, secure, and effective for all, including transgender women and non-transgender women.

For instance, the Rules of the City of New York mandate specific safeguards that closely align with PREA's standards. 40 RCNY § 5-18 (2017). Among them, the Department of Correction must use "risk screening" to inform housing assignments, ensuring that known sexual abusers are separated from those at higher risk of victimization. 40 RCNY § 5-18(a). Housing determinations must be individualized and cannot rely solely on physical anatomy. 40 RCNY § 5-18(b)-(d). Importantly, the personal safety concerns of transgender individuals must be afforded "serious consideration." 40 RCNY § 5-18(e). Similarly, in 2019, the New York State Department of Corrections and Community Supervision issued a directive requiring that transfer requests from incarcerated transgender individuals be evaluated on a case-by-case basis.[35] Where appropriate, housing assignments must reflect individual needs.[36] Taken together, these policies operationalize

---

[35] N.Y. State Dep't of Corr. Cmty. Supervision, *Inmate Reception/Classification*, Directive No. 4021 (Jan. 23, 2019).

[36] *Id.*

PREA's standards in recognition of the serious risks transgender women face while in prison.

## CONCLUSION

Amici States take seriously their duty to protect the health and wellbeing of their residents, including incarcerated people, by ensuring that transgender prisoners are housed in a manner which advances safety in compliance with PREA. Amici States' experience demonstrates that case-by-case housing assessments consistent with PREA are effective at ensuring the safety of all prisoners, including transgender prisoners. BOP's blanket policy, on the other hand, is based on animus and prevents the exercise of discretion in housing determinations, thus decreasing safety and making it more difficult to effectuate PREA's purpose of eliminating sexual assault in American prisons.

July 3, 2025

Respectfully submitted.
**ANDREA JOY CAMPBELL**
*Attorney General*
*Commonwealth of Massachusetts*

_____

Elizabeth Matos, BBO #671505
*Chief, Civil Rights Division and*
*Senior Advisor to the Attorney General*
One Ashburton Place, 4th Floor
Boston, MA 02108
(617) 963-2313
Elizabeth.matos@mass.gov
*Counsel for the Commonwealth of*
*Massachusetts*

ROB BONTA
  *Attorney General*
  *State of California*
1300 I Street
Sacramento, CA 95814

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawai'i*
425 Queen Street
Honolulu, Hawai'i 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
Office of the Attorney General
115 South LaSalle Street
Chicago, IL 60603

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, MN 55155

LETICIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, NY 10005

DAN REYFIELD
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, Vermont 05609

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,637 words and 23 pages, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirement of Rules 32(a)(4), 32(a)(5), and 32(a)(6) because the brief is double-spaced and has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word.

Dated: July 3, 2025 _____

ELIZABETH MATOS

# CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2025, I electronically filed the foregoing Brief of Amicus Curiae State of Massachusetts, et al. with the Clerk of the Court for the United States Court of Appeals for the District of Columbia using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: July 3, 2025                    _____

                                        ELIZABETH MATOS