IN THE

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**JANE DOE, ET AL.; JANE JONES, ET AL.; MARIA MOE,**

*Plaintiffs-Appellees,*

— v. —

**PAMELA BONDI, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, ET AL.; DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, ET AL.,**

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## BRIEF OF *AMICI CURIAE* FORMER CORRECTIONS OFFICIALS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

ALEXANDER L. CHEN
LGBTQ+ ADVOCACY CLINIC
WILMERHALE LEGAL SERVICES
CENTER OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 998-1054

LAWRENCE S. LUSTBERG
RUTH O'HERRON
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Counsel for* Amici Curiae

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... ii

RULE 29 CERTIFICATIONS................................................................. vii

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ......... viii

STATEMENT OF *AMICI*...........................................................................1

SUMMARY OF ARGUMENT ....................................................................4

ARGUMENT ...........................................................................................8

I.     TRANSGENDER WOMEN ARE AT SUBSTANTIAL RISK OF HARM IN MEN'S PRISONS, AND PLAINTIFFS ARE AMONG THOSE AT GREATEST RISK OF SUCH HARM. ....................................8

II.    CORRECTIONS OFFICIALS HAVE A FUNDAMENTAL RESPONSIBILITY TO PROTECT PARTICULARLY VULNERABLE PRISONERS, WHICH REQUIRES THAT THEY RETAIN DISCRETION TO DETERMINE APPROPRIATE HOUSING ASSIGNMENTS FOR TRANSGENDER INDIVIDUALS. ........................................................................17

III.   NEITHER PROTECTIVE CUSTODY NOR LOWER SECURITY MEN'S PRISONS IS AN APPROPRIATE HOUSING ASSIGNMENT FOR PLAINTIFFS. ............................................21

CONCLUSION ......................................................................................27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Estelle v. Gamble*,
429 U.S. 97 (1976)..............................................................................18

*Farmer v. Brennan*,
511 U.S. 825 (1994)........................................................... 18, 29, 21

*Helling v. McKinney*,
509 U.S. 25 (1993)............................................................................20

*Hope v. Pelzer*,
536 U.S. 730 (2002)..........................................................................20

*Johnson v. Prentice*,
144 S. Ct. 11 (2023)..........................................................................20

*Meriwether v. Faulkner*,
821 F.2d 408 (7th Cir. 1987) ...........................................................25

*Pitre v. Cain*,
562 U.S. 992 (2010)..........................................................................19

*Porter v. Clarke*,
923 F.3d 348 (4th Cir. 2019) ...........................................................25

*Porter v. Pa. Dep't of Corr.*,
974 F.3d 431 (3d Cir. 2020) .............................................................25

*Sheley v. Dugger*,
833 F.2d 1420 (11th Cir. 1987) .......................................................25

*Williams v. Sec'y Pa. Dep't of Corr.*,
848 F.3d 549 (3d Cir. 2017) .............................................................25

**Statutes**

Prison Rape Elimination Act of 2003, 34 U.S.C. § 30301, *et seq*...2, 3, 4, 11, 12, 27

## Other Authorities

Am. Corr. Assoc., Off. of Corr. Health Res. Ctr., *A Special Session Webinar, Transgender Care In Corrections: Where We Are And Where We're Going* (2018), https://perma.cc/C8W7-K263 ...............................15

Benjamin Steiner & John Wooldredge, *Examining the Sources of Correctional Officer Legitimacy,* 105 J. Crim. L. & Criminology 679, 683–84 (2015) ...........................................................................................20

Bureau of Just. Stats., U.S. Dep't of Just., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12* (2013), https://bjs.ojp.gov/content/pub/pdf/svpjri1112.pdf ...........................................10

Bureau of Just. Stats., U.S. Dep't of Just., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Table*s (2014), https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf.......................................10

David Radziewicz & Carole A. Mattis, *A Best Practice Approach: Providing Support Services to Transgender Inmates*, Am. Corr. Assoc., Corrections Today (July/Aug. 2018), https://perma.cc/D4JW-93VW .........................................................................15

Erica Bryant, *Violence, Torture, and Isolation: What It's Like to Be Trans in Prison*, Vera Inst. of Just. (Nov. 17, 2022), https://www.vera.org/news/violence-torture-and-isolation-what-its-like-to-be-trans-in-prison ...................................................................................26

Fed. Bureau of Prisons, *About Our Facilities* (last visited July 5, 2025), https://www.bop.gov/about/facilities/federal_prisons.jsp.................23, 24

Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, para. 60, Solitary Confinement, 7 Oct. 2013, United Nations General Assembly A/68/295, https://www.unodc.org/documents/justiceand-prison-reform/SPECIAL_RAPPORTEUR_EN.pdf ......................................................26

James Peguese and Robert Koppel, *Managing High-Risk Offenders In Prison Dormitory Settings* Nat'l PREA Res. Ctr, (July 2003), https://www. prearesourcecenter.org/sites/default/files/library/managinghighriskoffendersinprisondormitorysettings.pdf ................................23

Kelsie Chesnut & Jennifer Peirce, *Advancing Transgender Justice: Illuminating Trans Lives Behind and Beyond Bars*, Vera Inst. of Just. (Feb. 2024), https://vera-institute.files.svdcdn.com/production/downloads/publications/advancing-transgender-justice.pdf ...........................................................................24

Lawrence W. Sherman, *Defiance, Deterrence, and Irrelevance: A Theory of the Criminal Sanction,* 30 J. Res. Crime & Delinq. 445 (1993) ................................................................................................................21

Maurice Chammah, *Rape in the American Prison,* Atlantic (Feb. 25, 2015), https://www.theatlantic.com/politics/archive/2015/02/rape-in-the-american-prison/385550 .............................................................................9

Nat'l Comm'n on Corr. Health Care, *Position Statement: Transgender And Gender Diverse Health Care in Correctional Settings* (2020), https://www.ncchc.org/wp-content/uploads/Transgender-and-Gender-Diverse-Health-Care-in-Correctional-Settings-2020.pdf ......................15

Nat'l Ctr. For Transgender Equal., *LGBTQ People Behind Bars: A Guide To Understanding The Issues Facing Transgender Prisoners And Their Legal Rights*, 6 (2018), https://perma.cc/G9BD-HJVG ....................................................................26

Nat'l Inst. of Corr., *Policy Review and Development Guide: Lesbian, Gay, Bisexual, Transgender, and Intersex Persons In Custody* (2d ed. 2015), https://www.congress.gov/116/meeting/house/109200/documents/HHRG-116-JU00-20190402-SD036.pdf ............................................................10

Nat'l PREA Res. Ctr., *National PREA Resource Center Fact Sheet* (May 2014), available at https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/PRC-FS.pdf ................................................................................................................12

Nat'l PREA Res. Ctr., *PREA Standards: § 115.42 Use of screening information and Placement of residents*, https://www.prearesourcecenter.org/standard/115-42 (last visited July 5, 2025) ........................................................................................12

iv

Nat'l Prison Rape Elimination Comm'n Report (June 2009),
    https://www.prearesourcecenter.org/sites/default/files/library/
    NPREC-Final-Report.PDF ...........................................................9, 14

Rebecca Mann, *The Treatment of Transgender Prisoners, Not Just an
    American Problem – A Comparative Analysis of American,
    Australian, and Canadian Prison Policies Concerning the
    Treatment of Transgender Prisoners and a "Universal"
    Recommendation to Improve Treatment*, 15 Tul. J.L. & Sexuality
    91 (2006).........................................................................................15

Sharon Dolovich, *Cruelty, Prisons, and the Eighth Amendment,* 84
    N.Y.U. L. Rev. 881 (2009) ..............................................................20

Sharon Dolovich, *Strategic Segregation in the Modern Prison*, 48
    Am. Crim. L. Rev. 1 (2011)....................................................9, 16, 23

Steve J. Martin & Sheldon Ekland-Olson, *Texas Prisons: The Walls
    Came Tumbling Down* (1987) .............................................................3

Sylvia Rivera Law Project, *It's War In Here: A Report On The
    Treatment Of Transgender And Intersex People In New York State
    Men's Prisons* (2007), https://srlp.org/wp-
    content/uploads/2007/04/Its-War-In-Here-full-version.pdf ...............16

Valerie Jenness, *et al.*, *Sexual victimization against transgender
    women in prison: Consent and coercion in context*, Criminology
    603 (2020), https://onlinelibrary.wiley.com/doi/10.1111/1745-
    9125.12221......................................................................................16

Valerie Jenness, *et al.*, *Violence In California Correctional Facilities:
    An Empirical Examination Of Sexual Assault*, Center for Evidence-
    Based Corrections, 27 (Apr. 27 2007), https://bpb-us-
    e2.wpmucdn.com/sites.uci.edu/dist/0/1149/files/2013/06/Jenness-
    et-al._PREA-Report.pdfmplate.........................................................10

**Rules**

Fed. R. App. P. 29 ................................................................... vii

**Regulations**

28 C.F.R. § 115 ...............................................................................12

28 C.F.R. § 115.31 .........................................................................12

28 C.F.R. § 115.41 ...............................................................3, 14, 18

28 C.F.R. § 115.42 ...........................................5, 6, 7, 13, 14, 18

28 C.F.R. § 115.43(a).....................................................................26

90 Fed. Reg. 8615 .............................................................................6

**Constitutional Provisions**

U.S Const. amend. VIII........................................... 18, 19, 20, 25, 26, 27

## <u>RULE 29 CERTIFICATIONS</u>

All parties have consented to the timely filing of this *amicus* brief.

Pursuant to D.C. Circuit Rule 29(d), a separate *amicus* brief is necessary because *Amici Curiae* former corrections officials address the importance of discretion on the part of corrections officials in making housing determinations for prisoners, particularly transgender prisoners. No parties or other *Amici* in this matter offer the unique and firsthand perspective of former corrections officials who have worked extensively in prisons of varying security classifications across the country and are consequently well-versed in the unique considerations involved in making housing determinations for prisoners, including the legal implications of those decisions.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* certify that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *Amici* or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *Amici Curiae* former corrections officials certify as follows:

A. **Parties and *Amici*.** The former corrections officials listed in this brief are participating as *Amici Curiae* before this court. All parties, intervenors, and *Amici* appearing to date in this Court are contained or referenced in the Brief of Plaintiffs-Appellees, Doc. No. 2123121, filed on June 30, 2025.

B. **Rulings Under Review**. References to the rulings under review appear in the Brief of Plaintiffs-Appellees.

C. **Related Cases**. References to any related cases pending before this Court appear in the Brief of Plaintiffs-Appellees.

## STATEMENT OF *AMICI*

*Amici Curiae* are James Austin, Ph.D., Martin F. Horn, Steve J. Martin, Richard Morgan, Dan Pacholke, Emmitt Sparkman, Phil Stanley, and Eldon Vail, eight former high-ranking corrections officials with over half a century of combined experience in some of the largest correctional systems in the country. Each has worked at various levels of the prison system, from entry level staff to senior roles, including positions as final responsible authorities within their respective state and territorial systems. *Amici*'s experience spans a number of jurisdictions, working at or overseeing numerous facilities that collectively housed hundreds of thousands of prisoners.

As corrections professionals, *Amici*—identified in further detail below— have an interest in assuring that corrections facilities are managed in a manner consistent with sound penological principles. *Amici* thus respectfully submit this brief to inform the Court of common dynamics in corrections facilities relevant to this case, and bearing upon the basic responsibilities of officers working in these facilities to keep prisoners safe.

James Austin, Ph.D., is the founder of the JFA Institute which he launched in 2003. Prior to that, he served as the Director of the Institute of Crime, Justice and Corrections at George Washington University, and Executive Vice President for the National Council on Crime and Delinquency. He began his career in corrections with

the Illinois Department of Corrections in 1970 at Stateville and Joliet Penitentiaries. He has over 40 years of experience in correctional planning and research, including his work to develop population projections, risk assessment systems, prison and jail classification systems, violence reduction strategies, and program evaluations. He is the recipient of the American Correctional Association's Peter P. Lejin's Research Award, the Western Society of Criminology Paul Tappin Award, and the American Society of Criminology's Marguerite Q. Warren and Ted B. Palmer Differential Intervention Award.

Martin F. Horn served as Commissioner of the New York City Department of Corrections from 2003 to 2009, and as the Secretary of Corrections of Pennsylvania from 1995 to 2000. He has also served as Commissioner of the New York City Department of Probation, and as Executive Director of the New York State Sentencing Commission.

Steve J. Martin is the former General Counsel and Chief of Staff of the Texas prison system and has been appointed by the Governor of Texas to both a sentencing commission and a council for offenders with mental impairments. He also has served as an expert with the U.S. Department of Justice's Civil Rights Division where he worked on the development of standards for the enforcement of the Prison Rape Elimination Act ("PREA"). Mr. Martin was in the first class of certified PREA Auditors, and provided the Department of Justice with feedback on the certification

2

process. He coauthored a book on the history of prison reform in Texas,[1] and has written numerous articles on criminal justice issues.

Richard Morgan served as Secretary of the Washington State Department of Corrections from 2016 to 2017. In addition, he was appointed twice to Washington State's Parole Board and elected to the Walla Walla City Council, and he has served on the Board for the Washington State Coalition to Abolish the Death Penalty since 2012.

Dan Pacholke served as Secretary of the Washington State Department of Corrections from 2015 to 2016, working his way to the senior-most position for the department after a 33-year career as a Correctional Officer. He also held a prior administrative role in the Department, as the Director of the Prisons Division, during which he led the system-wide effort to implement PREA in prisons, community corrections, and work release facilities.

Phil Stanley served as Commissioner of the New Hampshire Department of Corrections from 2000 to 2003. He has also served in several positions in the Washington State Department of Corrections, including Superintendent of three prisons, Regional Administrator, and Probation Officer. He is currently a consultant

---

[1] Steve J. Martin & Sheldon Ekland-Olson, *Texas Prisons: The Walls Came Tumbling Down* (1987).

for prison and jail operations. He has approximately 49 years of experience in the field of corrections.

Eldon Vail served as Secretary of the State Department of Corrections of Washington from 2007 until 2011, after serving as Deputy Secretary of that Department from 1999 to 2006. As Secretary, he successfully reduced violence in the state prison system and implemented a wide array of evidence-based programs, including an intensive treatment program for people in prison with a mental illness and a step-down program for people held for long terms in solitary confinement.

## SUMMARY OF ARGUMENT

It is widely known within the corrections profession that transgender women in men's prisons face an extremely high risk of sexual violence and harassment. These risks are even greater for those who have previously been victimized, as many Plaintiffs in this appeal have been. *See* Brief of Plaintiffs-Appellees ("Pl.'s Br.") at 8–9. Given the vulnerability of transgender women in prisons, regulations, training standards, and screening procedures—including some mandated by the Prison Rape Elimination Act ("PREA")—have been implemented throughout the past two decades to address the safety of transgender women in prisons.

Sound correctional practices, as well as the United States Constitution and federal statutes and regulations, require corrections officials to take appropriate and proactive measures to protect vulnerable prisoners from harm, including serious

4

risks of sexual violence and harassment. Accordingly, Bureau of Prisons corrections officials are vested with the discretion to "make individualized determinations about how to ensure the safety of each inmate." 28 C.F.R. § 115.42(b). Specifically, by regulation, officials have the discretion to decide "whether to assign a transgender or intersex inmate to a facility for male or female inmates" and are required to do so "on a case-by-case basis," considering the "inmate's health and safety." *Id.* § 115.42(c). Thus, corrections officials sometimes determine that transgender women should be housed in women's facilities based upon an assessment of the serious risks of sexual violence and other harms they face in men's prisons. Indeed, in the cases at issue, Bureau of Prisons officials undertook the requisite individualized assessment of risk factors and determined that Plaintiffs should be placed in women's facilities, where Plaintiffs resided for months or years.

The unique vulnerabilities of the Plaintiffs in this case made this housing determination particularly appropriate. Nearly all of the Plaintiffs in this case have faced brutal prior sexual victimization in men's prisons—some, multiple times. *See* Pl.'s Br. at 8-9; JA374–75, ¶ 12, 17; JA382, ¶ 8; JA385, ¶ 6, 10. Plaintiffs have undergone extensive medical treatment, including surgeries, which makes them virtually indistinguishable from non-transgender women. *See* Pl.'s Br. at 21. They have received ongoing hormone treatments while incarcerated. *See id.* at 4. They live as women; they are referred to as women; they are considered women in the

5

women's facilities in which they reside; and most have legally changed their names or gender markers to reflect that they are women. *See, e.g.,* JA286, ¶ 6; JA375, ¶ 18; *see also* Pl.'s Br. at 4–5. And Plaintiffs' past placement in men's facilities has caused them to engage in self-harm, suicidal ideation, and suicide attempts. *See* Pl.'s Br. at 9. Accordingly, corrections officials properly determined that the safest and most appropriate housing for Plaintiffs was in women's facilities. Indeed, corrections officials reaffirmed these determinations repeatedly during the reassessments they are required to undertake twice a year. 28 C.F.R. § 115.42(d).

Contrary to this sound practice and in defiance of statutory, regulatory, and constitutional mandates, on January 20, 2025, President Trump enacted Executive Order 14168, which requires corrections officials to reverse their previous determinations of the safest housing assignments for Plaintiffs in this case and strips them of their discretion to place Plaintiffs in women's prisons. EO 14168, 90 Fed. Reg. 8615. This Executive Order, titled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, specifies that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2, 90 Fed. Reg. at 8615. In relevant part, the Executive Order requires the Attorney General to "ensure that males are not detained in women's prisons or housed in women's detention centers[.]" *Id.* § 4(a), 90 Fed. Reg. at 8616.

Contrary to the intent of Congress, Executive Order 14168 removes all discretion from corrections officials to determine the safest housing assignments for transgender women. *See* 28. C.F.R. § 115.42(a)–(g). In forbidding necessary measures to protect the safety of transgender women—including requiring corrections officials to undo prior assignments by transferring transgender women from women's facilities to men's facilities, when those corrections officials are aware that they experience much greater risks of harm as a result—Executive Order 14168 puts corrections officials in the untenable position of violating not only the fundamental duties of their job but also the minimum requirements for the care of prisoners imposed on them by the Constitution and the law. Moreover, stripping correctional officers of their discretion to make appropriate housing determinations for transgender women will result in prisons being less safe for both officers and prisoners.

The Government proposes utilizing low security men's prisons or protective custody as substitute housing assignments for Plaintiffs. But neither is an appropriate alternative assignment for Plaintiffs. As confirmed by the National Prison Rape Elimination Commission's research, and as *Amici* know from experience, men's prisons are inherently unsafe housing for transgender women like Plaintiffs, regardless of security classification. And placing transgender women in protective custody as a long-term housing assignment—amounting to solitary confinement—

is not only unfair but also presents constitutional problems as it may cause lasting psychological harm, exacerbating their punishment for no legitimate purpose.

In sum, Executive Order 14168 impermissibly interferes with the ability of corrections officials not only to properly fulfill their job duties but also to comply with their obligations under the law. The Executive Order accordingly cannot stand, as the district court correctly held. This Court should affirm the judgments below.

## ARGUMENT

### I.  TRANSGENDER WOMEN ARE AT SUBSTANTIAL RISK OF HARM IN MEN'S PRISONS, AND PLAINTIFFS ARE AMONG THOSE AT GREATEST RISK OF SUCH HARM.

Prisons are generally dangerous environments, but the danger is especially severe for transgender women who are housed in men's prisons, and even more severe for those who have been previously victimized, including nearly all of the Plaintiffs in this case. The danger that men's prisons pose to transgender women has been repeatedly documented by government entities. Most notably, the National Prison Rape Elimination Commission, a body created by Congress to study sexual abuse in prison and develop national standards on the subject, produced an extensive report in 2009 which found that "most male-to-female transgender individuals who are incarcerated are placed in men's prisons . . . [which] puts them at extremely high

risk for abuse."[2] That is in part because "male facilities have more documented cases of prison sexual assault, and male facilities rely more heavily on the power structures that fuel sexual assaults in prison."[3] And the culture of men's facilities create conditions in which transgender women, in particular, experience high risks of violence.[4] Under the power dynamic in men's prisons, hypermasculinity is rewarded and often perpetuated through the sexual domination of "anyone who can be perceived as at all feminine."[5] Transgender women "are regarded as female . . . and are thus automatic targets for sexual assault."[6] Thus, violence against transgender women in men's prisons must be understood as a problem which arises specifically from the social and power dynamics at play in men's facilities. In addition, a 2015 policy report issued by The National Institute of Corrections, an agency within the Bureau of Prisons responsible for providing assistance to corrections institutions,

---

[2] Nat'l Prison Rape Elimination Comm'n Report 74 (June 2009) ("2009 Commission Report"), https://www.prearesourcecenter.org/sites/default/files/library/NPREC-Final-Report.PDF.

[3] Maurice Chammah, *Rape in the American Prison,* Atlantic (Feb. 25, 2015), https://www.theatlantic.com/politics/archive/2015/02/rape-in-the-american-prison/385550; 2009 Commission Report, *supra* note 2 at 73.

[4] *See, e.g,* 2009 Commission Report, *supra* note 2 at 73–74 (finding that male-to-female transgender individuals are at "extremely high risk" of sexual abuse in men's prisons); *id*. at 148 (finding that "[t]ransgender girls are especially vulnerable" to sexual abuse in juvenile facilities).

[5] Sharon Dolovich, *Strategic Segregation in the Modern Prison*, 48 Am. Crim. L. Rev. 1, 16 (2011).

[6] *Id.* at 18.

concluded that "transgender women and girls are highly vulnerable to sexual abuse, especially when housed in facilities for men or boys."[7]

Government statistics confirm this reality. The most recent data available on inmate-reported sexual assaults in prisons from the Department of Justice's Bureau of Justice Statistics indicates that transgender prisoners are about ten (10) times more likely to be sexually assaulted than is the average adult prisoner.[8] Another study from the University of California, Irvine's Center for Evidence-Based Corrections, cited in the National Institute of Corrections policy report, found that fifty-nine (59) percent of transgender prisoners surveyed reported having experienced sexual assault during their time in prison, a staggering number that is thirteen (13) times greater than the general population sample.[9] These statistics make clear that "[e]ven

---

[7] Nat'l Inst. of Corr., *Policy Review and Development Guide: Lesbian, Gay, Bisexual, Transgender, and Intersex Persons In Custody*, 11 (2d ed. 2015), https://www.congress.gov/116/meeting/house/109200/documents/HHRG-116-JU00-20190402-SD036.pdf.

[8] *See* Bureau of Just. Stats., U.S. Dep't of Just., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Tables*, at 2 tbl. 1 (2014), https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf (stating that in a 2011–2012 survey of transgender adult inmates housed in state and federal prisons, 39.9% were victims of sexual assault); Bureau of Just. Stats., U.S. Dep't of Just., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, at 8–9 (2013), https://bjs.ojp.gov/content/pub/pdf/svpjri1112.pdf (finding that the overall rate of sexual assault for the adult prison population during the same year was 4.0%).

[9] *See* Nat'l Int. of Corr., *supra* note 7 at 11; Valerie Jenness, *et al.*, *Violence In California Correctional Facilities: An Empirical Examination Of Sexual Assault*, Center for Evidence-Based Corrections, 27 (Apr. 27 2007), https://bpb-us-e2.wpmucdn.com/sites.uci.edu/dist/0/1149/files/2013/06/Jenness-et-al._PREA-Report.pdfmplate.

when compared to other relatively vulnerable populations, transgender people are perilously situated."[10]

That transgender women are at a substantial risk of harm in men's prisons is common knowledge within the corrections profession. As the National Institute of Corrections has recognized, "[c]orrections officials are aware" of the particular vulnerabilities transgender prisoners face, including that "transgender women housed with men are at extremely high risk for abuse."[11] In particular, the corrections community has specifically been made aware of the elevated risk of sexual assault for transgender prisoners through the Prison Rape Elimination Act of 2003 ("PREA"), 34 U.S.C. § 30301, *et seq.* That Act was passed unanimously by both parties in Congress to, among other things, "establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States," 34 U.S.C. § 30302(1), mandate significant research of the issue, and require that the National Prison Rape Elimination Commission draft standards to prevent and eliminate prison rape, after Congress found that prison rape had reached "epidemic" levels, and that prison rape caused grave and lasting harm to its victims while at the same time endangering the safety of other prisoners, staff, and the general public, 34 U.S.C. § 30301(7)–(15).

---

[10] Nat'l Int. of Corr., *supra* note 7 at 11 (quotation marks omitted).
[11] *Id.* at 12 (quotation marks omitted).

Since PREA's passage two decades ago, the national standards that Congress mandated the National Prison Rape Elimination Commission to develop after extensive study have been implemented as regulations, *see* 28 C.F.R. Part 115, and these include standards regarding the training of corrections staff and screening of prisoners for risk of victimization or abuse. Thus, PREA's implementing regulations ("PREA National Standards") state that "[t]he agency shall train all employees who may have contact with inmates on . . . [t]he dynamics of sexual abuse and sexual harassment in confinement." 28 C.F.R. § 115.31. The trainings developed by the National PREA Resource Center, which is managed through a cooperative arrangement with the Bureau of Justice Assistance within the Department of Justice, are designed to fulfill this requirement.[12] As the National PREA Resource Center notes, the purpose of the PREA National Standards is to "reduce the risk of inmate-on-inmate sexual abuse and sexual harassment," including by "[p]roviding additional protections for transgender . . . inmates, based on the unique risks these populations face[.]"[13]

---

[12] Nat'l PREA Res. Ctr., *National PREA Resource Center Fact Sheet* (May 2014), available at https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/PRC-FS.pdf.
[13] Nat'l PREA Res. Ctr., *PREA Standards: § 115.42 Use of screening information and Placement of residents*, https://www.prearesourcecenter.org/standard/115-42 (last visited July 5, 2025).

When screening individuals for their risk status upon entering a facility, officers are required by the PREA National Standards to determine "[w]hether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming." 28 C.F.R. § 115.41(d)(7). Further, with respect to housing assignments, the PREA National Standards specifically recognize the danger to transgender prisoners discussed above. Thus, the PREA National Standards require that the decision "whether to assign a transgender . . . inmate to a facility for male or female inmates" be made on a "case-by-case basis" to "ensure the inmate's health and safety," 28 C.F.R. § 115.42(c) and that this housing placement be reassessed at least twice a year "to review any threats to safety experienced by the inmate." *Id.* § 115.42(d).

Moreover, as is relevant to multiple Plaintiffs in this case, government research emphasizes that prisoners who have previously been victimized are particularly vulnerable. Thus, the most recent Bureau of Justice Statistics data indicates that prisoners who were sexually assaulted before entering their current facility were sexually assaulted by another inmate at their current facility at a rate twenty (20) times higher than those who had not been previously victimized.[14] That,

---

[14] Bureau of Just. Stats., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, *supra* note 8 at 18 tbl. 8 (finding that 12.0% of prisoners who had been victims of sexual assault prior to coming to their current facility reported being sexually assaulted by another inmate at the current facility, while only 0.6% of the

of course, is the case here, as multiple Plaintiffs in this matter have been previously assaulted and/or raped at Bureau of Prisons men's facilities. *See* JA192; JA195; JA196; JA370; JA385. This is not unusual: the National Prison Rape Elimination Commission also highlighted past victimization as a key risk factor for sexual abuse in prison, and thus recommended that "prior sexual victimization" be among the criteria used to screen inmates for risk of sexual abuse.[15] Accordingly, the PREA National Standards require corrections officials to screen all inmates for prior experiences of sexual abuse as part of their assessment of the inmate's risk of sexual victimization, 28 C.F.R. § 115.41(d)(8), and to take this information into account when determining appropriately safe housing for that inmate, 28 C.F.R. § 115.42(a).

In addition to these federal regulations mandated by Congress and the Government reports and statistics described above, the publications of professional corrections organizations also reflect the consensus among corrections officials that incarcerated transgender individuals face an elevated risk of harm. For example, the American Correctional Association, the oldest and largest trade association and accrediting body for the corrections industry, has published articles and made presentations highlighting the vulnerability of transgender prisoners. These presentations note that transgender prisoners are "statistically at an increased risk of

---

population that had not previously been victimized reported sexual assault by another inmate at the current facility).

[15] 2009 Commission Report, *supra* note 2 at 71.

sexual victimization"[16] and lay out strategies for officers to keep transgender prisoners safe in their housing.[17] Similarly, the National Commission on Correctional Health Care has issued a position statement on transgender and gender non-conforming prisoners acknowledging that members of this group are "common targets for violence" and that staff should therefore "periodically assess the safety of transgender patients," including by taking "appropriate safety measures regarding housing[.]"[18]

In men's prisons, characterized as they are by the prevalence of aggressive behaviors designed to control other prisoners,[19] transgender prisoners are often

---

[16] David Radziewicz & Carole A. Mattis, *A Best Practice Approach: Providing Support Services to Transgender Inmates*, Am. Corr. Assoc., Corrections Today (July/Aug. 2018), https://perma.cc/D4JW-93VW.

[17] Am. Corr. Assoc., Off. of Corr. Health Res. Ctr., *A Special Session Webinar, Transgender Care In Corrections: Where We Are And Where We're Going* (2018), https://perma.cc/C8W7-K263.

[18] Nat'l Comm'n on Corr. Health Care, *Position Statement: Transgender And Gender Diverse Health Care in Correctional Settings* 4–5 (2020), https://www.ncchc.org/wp-content/uploads/Transgender-and-Gender-Diverse-Health-Care-in-Correctional-Settings-2020.pdf.

[19] *See, e.g.,* 2009 Commission Report, *supra* note 2 at 73 ("Men's correctional facilities tend to have very rigid cultures that reward extreme masculinity and aggression and perpetuate negative stereotypes about men who act or appear different. In this environment, gay, bisexual, and gender-nonconforming individuals are often the targets of sexual abuse precisely because the dominant 'straight' males expect and demand submission."); Rebecca Mann, *The Treatment of Transgender Prisoners, Not Just an American Problem – A Comparative Analysis of American, Australian, and Canadian Prison Policies Concerning the Treatment of Transgender Prisoners and a "Universal" Recommendation to Improve Treatment*, 15 Tul. J.L. & Sexuality 91, 105 (2006) (explaining how "[t]he nature of the prison hierarchy in a male facility ranks prisoners based on their fighting ability and

referred to using derogatory slurs and subjected to physical and sexual abuse due to their perceived effeminacy.[20] These behavioral patterns reflect the prison power dynamic discussed above, which make transgender women particularly vulnerable to victimization by virtue of being seen as female. *See* Dolovich, *supra* note 5. Nor is this harassment limited to verbal abuse; "[i]n the prison context . . . verbal sexual harassment is often used in a strategic way, to alert the target that [she] has been singled out for more serious sexual victimization and may soon face a forcible rape." *Id.* at 12 (citation omitted).

There is no question, then, that, in the setting of men's prisons, transgender women experience daily harassment, abuse, and a statistically-documented, serious risk of physical and sexual harm. But beyond that reality, those like Plaintiffs in this case stand out as among the most vulnerable even in that group. As government

---

manliness" which "places male-to-female transgender inmates at special risk for physical injury, sexual harassment, sexual battery, rape, and death, because the prison hierarchy subjugates the weak to the strong and equates femininity with weakness." (quotation marks omitted)).

[20] *See, e.g.,* Valerie Jenness et al., *Sexual victimization against transgender women in prison: Consent and coercion in context*, 57 Criminology 603, 617 (2020), https://www.researchgate.net/publication/335350919_Sexual_victimization_agains t_transgender_women_in_prison_Consent_and_coercion_in_context (detailing that transgender prisoners "report[ed] routinely being called a 'faggot,' 'punk,' and 'bitch.'"); Sylvia Rivera Law Project, *It's War In Here: A Report On The Treatment Of Transgender And Intersex People In New York State Men's Prisons* 17–33 (2007), https://srlp.org/wp-content/uploads/2007/04/Its-War-In-Here-full-version .pdf (detailing through personal stories the humiliation, harassment and violence transgender women in men's prisons face on a daily basis).

statistics, regulations, and reports make clear, transgender women who have previously been victimized, as Plaintiffs have, are at a significantly heightened risk of harm. Indeed, after Plaintiffs were transferred from women's to men's facilities, following the issuance of Executive Order 14168, they experienced "continuous sexual harassment from male prisoners; invasive strip searches from male [Bureau of Prison] officers; lack of access to women's clothing, including undergarments; and reasonably feared that they would be targeted for sexual violence." Pl.'s Br. at 13. As such, their housing placement in women's facilities is a diligent and proper exercise of corrections officials' discretion—one that should be left to those prison officials as opposed to mandated by a sweeping order that removes that discretion.

## II. CORRECTIONS OFFICIALS HAVE A FUNDAMENTAL RESPONSIBILITY TO PROTECT PARTICULARLY VULNERABLE PRISONERS, WHICH REQUIRES THAT THEY RETAIN DISCRETION TO DETERMINE APPROPRIATE HOUSING ASSIGNMENTS FOR TRANSGENDER INDIVIDUALS.

Corrections officials have the responsibility to take precautions to protect prisoners who they know are vulnerable to significant risks of harm. Protecting particularly vulnerable groups from significant risks of harm is not merely a matter of best practices—it is a fundamental and constitutionally mandated requirement of the job. Indeed, the Supreme Court has repeatedly held that where corrections officials are aware of the risk of harm to a particular prisoner but act in a way that is

17

deliberately indifferent to such risk of harm, they violate the constitutional rights of that individual under the Eighth Amendment. *See Farmer v. Brennan,* 511 U.S. 825, 833–34 (1994) ("prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." (citation omitted)); *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) ("Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action . . ."). Indeed, such indifference constitutes the unnecessary and wanton infliction of pain, which is inconsistent with contemporary standards of decency and thus violates the Constitution. *Estelle,* 429 U.S. at 103.

In the context of housing assignments, the PREA National Standards likewise require corrections officials to protect prisoners who may be vulnerable to sexual abuse: officials must select a transgender prisoner's housing placement based not upon their sex assigned at birth, but upon which placement would effectively protect their "health and safety," taking into account their "risk of being sexually abused" which requires consideration of both their gender identity and whether they have "previously experienced sexual victimization." 28 C.F.R. §§ 115.41(a), (d)(7)–(8), 115.42(c). Given the widely known, extremely high risks of sexual abuse that transgender women face in men's prisons, corrections officials must have discretion to place such individuals in women's prisons—as they did with regard to each of the

18

Plaintiffs in this case, JA171; JA369–370; JA460—if they are to fulfill these obligations to protect prisoners facing a known risk of harm.

Executive Order 14168 strips this discretion from Bureau of Prisons corrections officials and, in doing so, violates statutory, regulatory, and constitutional mandates. That is, the Executive Order not only forces corrections officials to reverse their prior decisions to house Plaintiffs in women's prisons—made after careful consideration of unique threats to Plaintiffs' safety—it also strictly cabins their discretion going forward, requiring them to transfer all transgender women to men's facilities, without regard to the factors they are required to consider under the law, including the PREA National Standards, when making housing determinations. Most significantly, Executive Order 14168 requires them to do that which the Constitution specifically prohibits: to ignore a known risk to the safety of prisoners in their care, thereby subjecting them to certain harm. *See Farmer,* 511 U.S. at 837 ("a prison official can[] be found liable under the Eighth Amendment . . . [if he or she] knows of and disregards an excessive risk to inmate health or safety."; *see also Johnson v. Prentice,* 144 S. Ct. 11, 14 (2023) (reaffirming that any prison official who knows of and disregards an excessive risk to inmate health or safety has violated the constitutional rights of that inmate); *Pitre v. Cain,* 562 U.S. 992 (2010) (holding that a claim of deliberate indifference was sufficiently stated where the plaintiff alleged that he was subjected to prison labor that posed a

19

substantial risk of serious harm to his health); *Hope v. Pelzer,* 536 U.S. 730 (2002) (holding that an official who acted with deliberate indifference to a substantial risk of physical harm violated the rights of the prisoner); *Helling v. McKinney,* 509 U.S. 25 (1993) (establishing that contemporary standards of decency require that the State provide for a person's reasonable safety when it has incarcerated them); Sharon Dolovich, *Cruelty, Prisons, and the Eighth Amendment,* 84 N.Y.U. L. Rev. 881, 915 (2009) ("To force prisoners to live in constant fear of violent assault, under conditions in which many of the most vulnerable among them can expect that fear to be realized, is to inflict a form of physical and psychological suffering akin to torture." (citations omitted)).

As a result, Executive Order 14168 is likely to make prisons more unsafe generally, and consequently to further exacerbate the substantial risk of harm to transgender women in prisons. This is so because, as *Amici* know from their extensive experience working in prisons, when corrections officials are stripped of their authority—here, the power to protect vulnerable groups in their care—they lose their legitimacy as authority figures. *See* Benjamin Steiner & John Wooldredge, *Examining the Sources of Correctional Officer Legitimacy,* 105 J. Crim. L. & Criminology 679, 683–84 (2015) (explaining that "correctional officer legitimacy [is] a multidimensional concept involving . . . inmates' general perceptions of officers' procedural fairness, distributive fairness, and effectiveness."); *id.* at 701

("Inmates who felt more vulnerable as a result of experiencing victimization may have lost faith in the correctional officers' abilities and/or willingness to keep them safe."). And as *Amici* also know, where correctional officers' legitimacy in a prison is questioned, prisons are less safe for prisoners and officers alike. *Id.* at 684 (noting that correctional officer legitimacy is linked to increased order and safety, as well as increased likelihood of reform); *see also* Lawrence W. Sherman, *Defiance, Deterrence, and Irrelevance: A Theory of the Criminal Sanction,* 30 J. Res. Crime & Delinq. 445, 460–61 (1993) (describing that a perceived lack of legitimacy of a sanctioning agent, such as a prison official, is likely to inspire defiance of the law). In sum, Executive Order 14168 harms not only Plaintiffs but everyone in the prison settings where it is enforced, because it undermines corrections officers' discretion and legitimacy, and prevents them from fulfilling all of their responsibilities, including but not limited to their constitutional mandate to protect vulnerable prisoners.

## III. NEITHER PROTECTIVE CUSTODY NOR LOWER SECURITY MEN'S PRISONS IS AN APPROPRIATE HOUSING ASSIGNMENT FOR PLAINTIFFS.

Implicitly conceding the vulnerability of transgender women—and, in particular, Plaintiffs—in men's prisons, the Government proposes to house Plaintiffs in this case, and transgender women generally, in lower security men's prisons or in protective custody. Brief of Defendants-Appellants ("Defs' Br.") at 10–14, 32. That

is, the Government argues that "placing [Plaintiffs] at a low security institution with non-violent offenders would minimize the likelihood that they would be victimized." *Id*. at 13 (internal quotations omitted). The Government further argues that "the rates of sexual assault at the chosen [lower security] facilities [are] low," and the "overall rates of assault are often lower than at the female facilities where plaintiffs are currently housed." *Id.*

But this argument does not address Plaintiffs' unique situation. Whatever the *overall* rates of physical and sexual assault at lower security men's prisons, they do not reflect the risks that transgender women, specifically, experience in such prisons, much less these particular Plaintiffs. As noted above, the National Prison Rape Elimination Commission and others who have researched the issue have consistently found that transgender women experience significantly greater rates of victimization than the general population does in men's prisons—and the Commission did not note any exception to this finding for lower security men's prisons. *See supra* at 8–11. In this regard, the district court was correct in holding that the Government's "statistics do not disaggregate assaults against transgender inmates from overall rates of assault," JA187, and thus do not address transgender women's safety issues.

Lower security men's prisons do not alleviate the serious risks to Plaintiffs because it is ultimately the reality of life in men's prisons that risks the safety of transgender women, regardless of security classification. Moreover, lower security

men's prisons often have dormitory-style housing where individuals sleep in bunk beds, in the open, without any partitions, and within feet of other individuals.[21] In this setting, transgender women are "automatic targets" for harassment and violence.[22] Indeed, resources from the National PREA Resource Center have highlighted the risks of violence in dormitory-style housing as a result of the increased exposure between incarcerated individuals, noting that there is "an extensive history of violence in dormitories" that causes some individuals to choose to sleep fully dressed, including in shoes, to protect against assaults while others join gangs for protection, and that the "presence of gang activity presents additional concerns . . . particularly in the dormitory setting where there are approximately 100 inmates to provide support to one another."[23] And, although the Government asserts that transgender women pose a threat to the "bodily privacy" of women in women's facilities, in which Plaintiffs have resided for months and years, Defs. Br. at 24, it is

---

[21] *See* Fed. Bureau of Prisons, *About Our Facilities* (last visited July 5, 2025), https://www.bop.gov/about/facilities/federal_prisons.jsp (stating that minimum-security Bureau of Prisons facilities have "dormitory housing" and "a relatively low staff-to-inmate ratio"; low-security facilities have "mostly dormitory or cubicle housing," and a higher staff-to-inmate ratio; medium-security prisons have "mostly cell-type housing," and an "even higher staff-to-inmate ratio than low security FCIs"; and high-security facilities have "multiple- and single-occupant cell housing" with "the highest staff-to-inmate ratio."

[22] Dolovich, *supra* note 5 at 18.

[23] James Peguese and Robert Koppel, *Managing High-Risk Offenders In Prison Dormitory Settings* Nat'l PREA Res. Ctr, (July 2003), https://www.prearesourcecenter.org/sites/default/files/library/managinghighriskoffendersin prisondormitorysettings.pdf.

the privacy of Plaintiffs that is invaded in a dormitory-style setting where, though they live as women, they would be forced to live, sleep, and interact in close proximity to men. Moreover, there are often fewer corrections officers in lower security men's facilities, and parts of dormitories that go unmonitored by staff, reducing the possibility that acts of violence can be prevented or quickly interrupted by corrections officials and thus increasing the risk of harm to transgender women in these prisons.[24] Indeed, perhaps the strongest evidence that lower security men's prisons are not safe for Plaintiffs is the fact that multiple Plaintiffs in this case have *already* been assaulted and harassed by men in minimum and low security men's prisons. *See* JA374, ¶ 10, 12; JA382, ¶ 13; JA233–234, ¶ 11.

Second, the Government argues that corrections officials can ensure the safety of transgender women in men's prisons by removing them from general population and placing them in protective custody. Defs.' Br. at 32. But, as set forth above, the risks to transgender women in men's prisons are ongoing and constant, not episodic. Thus, in effect, this solution amounts to the use of protective custody as a long-term housing solution for Plaintiffs.[25] This raises serious constitutional concerns, as courts

---

[24] Fed. Bureau of Prisons, *supra* note 21; Peguese & Koppel, *supra* note 23 (noting that dormitory-style housing is often patrolled by an officer on a catwalk overlooking the dorm, but that "dorms have blind spots, such as bathrooms and showers, that obstruct an officer's view").

[25] Indeed, this practice is all too common: a comprehensive report by the Vera Institute of Justice found that ninety (90) percent of surveyed transgender prisoners had experienced extended solitary confinement while incarcerated. Kelsie Chesnut

throughout the country have agreed. In *Porter v. Pa. Dep't of Corr.,* the Third Circuit concluded that prolonged solitary confinement creates a substantial risk of psychological and physical harm in violation of the Eighth Amendment, because such confinement is "psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage." 974 F.3d 431, 441–42 (3d Cir. 2020) (quoting *Williams v. Sec'y Pa. Dep't of Corr.,* 848 F.3d 549, 566 (3d Cir. 2017). Other Courts of Appeals are in accord. *See, e.g., Porter v. Clarke,* 923 F.3d 348, 353 (4th Cir. 2019) (concluding that multiple death row inmates held in prolonged solitary confinement in Virginia were subjected to a substantial risk of harm to which state officials were deliberately indifferent, in violation of the Eighth Amendment); *Meriwether v. Faulkner,* 821 F.2d 408, 416–17 (7th Cir. 1987) (holding that allegation that solitary confinement may violate the Constitution stated a claim because it denies the individual "adequate recreation, living space, educational and occupational rehabilitation opportunities, and associational rights for nonpunitive reasons," particularly when "feasible alternatives" to solitary confinement exist); *see generally Sheley v. Dugger,* 833 F.2d 1420, 1429 (11th Cir. 1987) (holding that solitary confinement may violate the

---

& Jennifer Peirce, *Advancing Transgender Justice: Illuminating Trans Lives Behind and Beyond Bars*, Vera Inst. of Just. (Feb. 2024), https://vera-institute.files.svdcdn.com/production/downloads/publications/advancing-transgender-justice.pdf.

Eighth Amendment if it is punitive, shocks the conscience, is grossly disproportionate to the offense, or is totally without penological justification).

Here, the Government's suggestion that Plaintiffs could be placed in protective custody in men's prisons raises particular Eighth Amendment concerns because corrections officials had already determined that the best course to protect Plaintiffs' safety was to place Plaintiffs in women's prisons for months and even years prior to the issuance of Executive Order 14168. *See* JA186 (district court finding that "the *only* change in circumstances from when the initial housing determination was made to now is Executive Order 14168."). Moreover, the PREA National Standards explicitly prohibit the involuntary segregation of transgender prisoners "unless an assessment of all available alternatives has been made." 28 C.F.R. § 115.43(a). This is for good reason: prolonged solitary confinement can cause harm equivalent to that of torture—and in fact, is considered torture by human rights experts, when used for longer than fifteen days[26]—particularly for vulnerable individuals, such as transgender women, who have already been victimized in other ways.[27] Accordingly, housing in protective custody, like placing transgender women

---

[26] *See* Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, para. 60, Solitary Confinement, 7 Oct. 2013, United Nations General Assembly A/68/295, https://www.unodc.org/documents/justiceand-prison-reform/SPECIAL_RAPPORTEUR_EN.pdf
[27] *See* Nat'l Ctr. For Transgender Equal., *LGBTQ People Behind Bars: A Guide To Understanding The Issues Facing Transgender Prisoners And Their Legal Rights*, 6 (2018), https://perma.cc/G9BD-HJVG; *see generally* Erica Bryant,

in lower security facilities, does not alleviate the extreme risks of harm that men's prisons pose to Plaintiffs and others similarly situated.

## CONCLUSION

As the Supreme Court has recognized, sexual abuse of prisoners "serves absolutely no penological purpose." *Farmer*, 511 U.S. at 852. Through their training and on-the-job experiences, *Amici* and other corrections officials are well aware that transgender women, and especially those who have previously been victimized, experience significantly higher risks of sexual violence and other harms in men's prisons. The Eighth Amendment, the Prison Rape Elimination Act and its implementing regulations, and sound correctional practice all require corrections officials to protect vulnerable prisoners, including transgender women, from sexual abuse and other harm. In order for corrections officials to carry out this mandate, they must have discretion to house transgender women in women's prisons. By extinguishing Bureau of Prisons officials' discretion to do so, Executive Order 14168 forbids them from fulfilling both the requirements of their jobs and their basic obligations under the Constitution. Nor are the Government's proposed housing assignments for Plaintiffs—to lower security means facilities or protective custody—an appropriate response to these concerns. For all of these reasons, and

---

*Violence, Torture, and Isolation: What It's Like to Be Trans in Prison*, Vera Inst. of Just. (Nov. 17, 2022), https://www.vera.org/news/violence-torture-and-isolation-what-its-like-to-be-trans-in-prison.

those set forth by Plaintiffs-Appellees, this Court should affirm the judgments below, which would in turn enable corrections officials to continue protecting the most vulnerable prisoners in their care and maintain the integrity of *Amici*'s profession.

Dated: July 7, 2025        Respectfully submitted,
<u>s/ Lawrence S. Lustberg</u>
Lawrence S. Lustberg
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
Phone: 973-596-4500
llustberg@gibbonslaw.com

*Counsel for* Amici Curiae

# **CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5), because it contains 6,490 words, calculated by the word processing system used in its preparation (Microsoft Word), and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.


Dated: July 7, 2025                         s/ Lawrence S. Lustberg
                                            Lawrence S. Lustberg

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of July 2025, I caused a true copy of the foregoing to be filed through the Court's CM/ECF system, which will automatically serve all counsel of record.

Dated: July 7, 2025                           <u>s/ Lawrence S. Lustberg</u>

                                                                    Lawrence S. Lustberg